**OFFSHORE PIPELINES, INC. and OPI International, Inc., Appellants,**

**v.**

**Edward Lamar SCHOOLEY, Appellee.**

**No. 01–96–00575–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 1, 1998.

Rehearing Overruled Feb. 25, 1999.

---

Chris A. Lorenzen, Jr., Houston, for Appellants.

Robert D. Rapp, Houston, for Appellee.

Before MIRABAL, TAFT, JJ. and FRANK G. EVANS, J.[1]

---

1. The Honorable Frank G. Evans, retired Chief Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

**. OPINION**

FRANK G. EVANS, Justice (Retired).

Edward Lamar Schooley sued Offshore Pipelines, Inc. and OPI International, Inc. (collectively referred to as "OPI"), alleging negligence under the Jones Act (46 U.S.C.App. § 688 (1994)) and unseaworthiness under general maritime law, and seeking damages for personal injuries allegedly sustained while employed by OPI as an electrician onboard the *Derrick Barge II* (the "DB II"). A jury, finding OPI negligent and that its barge was unseaworthy, assessed damages against OPI in the amount of $840,-000. The trial court entered judgment for Schooley in that amount, plus prejudgment interest. OPI brings this appeal, asserting eight points of error. We modify the trial court's judgment, and as modified, affirm.

### Points of Error 1 and 2

### No Evidence Complaints

We first consider OPI's points of error one and two, which assert "no evidence" complaints to the jury's findings on the liability issues. In essence, OPI argues under these points that Schooley failed to produce legally sufficient evidence to show either "medical causation under the Jones Act or general maritime law," or that "any alleged acts of negligence or conditions of seaworthiness caused Schooley's injuries." In our review of these points, we will also consider OPI's sixth point of error in which it argues that the trial court committed reversible error in instructing the jury that "if a party fails to produce evidence which is under its control and reasonably available to it and not reasonably available to the adverse party, then [the jury] may infer that the evidence is unfavorable to the party who could have produced it and did not."

**The Jones Act Claim**

A claim of negligence under the Jones Act and a claim of unseaworthiness under general maritime law are two separate and distinct claims. *See Phillips v. Western Co.*

*of N. Am.*, 953 F.2d 923, 928 (5th Cir.1992). The Texas Supreme Court in *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402 (Tex. 1998) speaking through Justice Baker, recently outlined the nature of the Jones Act:

> The Jones Act provides a cause of action for maritime workers injured by an employer's negligence. Federal law provides that a party asserting an admiralty action may bring the action in state court. *See* 28 U.S.C. § 1333(1). When a state court hears an admiralty case, that court occupies essentially the same position occupied by a federal court sitting in diversity: the state court must apply substantive federal maritime law but follow state procedure. *See Texaco Ref. & Mkt., Inc. v. Estate of Dau Van Tran*, 808 S.W.2d 61, 64 (Tex. 1991); *see also General Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex.1993).

Under the Federal Employers' Liability Act (FELA), a related statute, the causation burden is not the common law proximate cause standard. Rather, the causation burden is "whether the proof justifies with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury for which the claimant seeks damages." *Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 506–07, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957); *Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 302 (5th Cir.1984). This burden has been termed "featherweight." *See Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1352 (5th Cir.1988); *see also Sentilles v. Inter–Caribbean Shipping Corp.*, 361 U.S. 107, 109–10, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959). The Jones Act expressly incorporates FELA and the case law developing that statute. *See Ferguson v. Moore-McCormack Lines, Inc.*, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957). Thus, the causation standard under the Jones Act is the same as that under FELA. *See American Dredging Co. v. Miller*, 510 U.S. 443, 456, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994); *see also Brown & Root, Inc. v. Wade*, 510

S.W.2d 408, 410 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.).

*Ellis,* 971 S.W.2d at 405–06.

The Fifth Circuit Court of Appeals, quoting the United States Supreme Court's language in *Ferguson v. Moore–McCormack Lines, Inc.,* 352 U.S. 521, 523, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957), recently confirmed that the proper standard for reviewing a jury's finding of *causation* in a Jones Act case is "simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331, 335, 339 (5th Cir.1997) (holding further that "ordinary prudence" is proper standard to be applied in determining duty of care owed by employer or by seaman). *Id.* at 339.

**The Unseaworthiness Claim**

 To prove that a vessel is unseaworthy under general maritime law, a plaintiff must prove that the defendant provided a vessel (including its appurtenances, gear, and equipment) not reasonably fit for its intended purpose. *Phillips,* 953 F.2d at 928. Because the defendant's duty to provide a seaworthy vessel is completely independent of its duty to exercise reasonable care, the plaintiff does not have to prove the defendant was negligent. *Id.* However, the plaintiff is required to meet a more demanding standard of proximate causation than is applicable to Jones Act claims. *Id.* The plaintiff must show that the "unseaworthy condition played a 'substantial part' in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the vessel's unseaworthiness." *Id.*

**The Court's Charge and the Jury's Findings**

In our review of the points challenging the legal and factual sufficiency of evidence, we have considered the jury's verdict on the evidence in light of the court's charge to the jury. The court instructed the jury as follows:

*Jones Act—Negligence*

Under the Jones Act, the plaintiff Edward Lamar Schooley must prove that his employer was negligent. Negligence is the doing of an act that a reasonably prudent person would not do, or the failure to do something that a reasonably prudent person would do, under the same or similar circumstances. The occurrence of an accident, standing alone, does not mean that anyone's negligence caused the accident.

In a Jones Act claim, the word "negligence" is given a liberal interpretation. It includes any breach of duty that an employer owes to his employees who are seamen, including the duty of providing for the safety of the crew.

Under the Jones Act, if the employer's negligent act or omission played any part, no matter how small, in actually causing the plaintiff Edward Lamar Schooley's injury, then you must find that the employer is liable under the Jones Act.

Negligence under the Jones Act may consist of a failure to comply with a duty required by law. Employers of seamen have a duty to provide their employees with a reasonably safe place to work. If you find that the plaintiff Edward Lamar Schooley was injured because the defendants failed to furnish him with a reasonably safe place to work, and that the plaintiff's working conditions could have been made safe through the exercise of reasonable care, then you must find that the defendants were negligent.

The fact that the defendants conducted their operations in a manner similar to that of other companies is not conclusive as to whether the defendants were negligent or not.

You must determine if the operation in question was reasonably safe under the circumstances. The fact that a certain practice has been continued for a long period of time does not necessarily mean that it is reasonably safe under all circumstances. A long accepted practice may be an unsafe practice. However, a practice is not necessarily unsafe or unreasonable merely because it injures someone.

A seaman's employer is legally responsible for the negligence of its employees while that employee is acting within the course and scope of his employment.

## Unseaworthiness

The plaintiff Edward Lamar Schooley seeks damages for personal injury that he claims was caused by the unseaworthiness of the defendants' vessel, the DB II.

A shipowner owes to every member of the crew employed on its vessel the absolute duty to keep and maintain the ship, and all decks and passageways, appliances gear, tools, parts, and equipment of the vessel in a seaworthy condition at all times.

A seaworthy vessel is one that is reasonably fit for its intended use. The duty to provide a seaworthy vessel is absolute because the owner may not delegate that duty to anyone. Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame. If an owner does not provide a seaworthy vessel, a vessel that is reasonably fit for its intended use, no amount of care or prudence excuses the owner.

The duty to provide a seaworthy vessel includes a duty to supply an adequate and competent crew. A vessel may be unseaworthy even though it has a numerically adequate crew, if too few persons are assigned to a given task.

However, the owner of a vessel is not required to furnish an accident free ship. He need only furnish a vessel and its appurtenances that are reasonably adequate for their assigned tasks.

The shipowner is not required to provide the best appliances and equipment, or the finest of crews, on his vessel. He is only required to provide gear that is reasonably proper and suitable for its intended use, and a crew that is reasonably adequate. In summary, if you find that the owner of the vessel did not provide an adequate crew of sufficient manpower to perform the tasks required, or if you find that the vessel was in any manner unfit in accordance with the law as I have just explained to you and that this was a proximate cause of the injury, a term I will explain to you,

then you may find that the vessel was unseaworthy and the shipowner liable, without considering any negligence on the part of the defendants or their employees.

However, if you find that the owner had a capable crew and appliances and gear that were safe and suitable for their intended use, then the vessel was not unseaworthy and the defendants are not liable to the plaintiff on the claim of unseaworthiness.

## Causation

Not every injury that follows an accident necessarily results from it. The accident must be the cause of the injury.

In determining causation, different rules apply to the Jones Act claim and to the unseaworthiness claim.

Under the Jones Act, an injury or damage is considered cause [sic] by an act, or failure to act, if the act or omission played any part, no matter how small, in bringing about or actually causing the injury or damage.

In an unseaworthiness claim, the plaintiff must show, not merely that the unseaworthiness condition was the cause of the injury but that such condition was a proximate cause of it. This means that the plaintiff must show that the act or omission played a substantial part in bringing about or actually causing his injury, and the injury was either a direct result or a reasonably probable consequence of the act or omission.

The court further instructed the jury regarding circumstantial evidence and on the legal effect of acts or omissions of corporate agents and employees while acting in the course and scope of their authority.

In response to the questions submitted, the jury found that:

(1) OPI was negligent and that such negligence was a legal cause of Schooley's damages;

(2) The DB II was unseaworthy and that such unseaworthiness was a legal cause of Schooley's damages; and

(3) Schooley suffered damages for pain and suffering in the past and future,

loss of past and future wages, loss of and inconvenience to the normal pursuits and pleasures of life in the future, and past and future physical impairment and disfigurement in the aggregate sum of $840,000.

## The Parties' Contentions

From June 26, 1991 to September 28, 1991, Schooley was assigned to the DB II as a journeyman electrician. During this period, Schooley alleges he developed an intestinal tumor as a result of drinking water on the DB II. He claims that because of OPI's negligence, the drinking water on the DB II was contaminated with Yersinia bacteria, which caused his illness, and that this condition also rendered the vessel unseaworthy.

In response, OPI contends: (1) that the undisputed evidence shows Yersinia bacteria could have been transmitted to Schooley through any one of the four sources: food, water, animals, or people; (2) that Schooley's own medical expert testified that Schooley might have been exposed to the bacteria at any time during a period of a year or more to three months before he was admitted to the hospital; and (3) that Schooley's expert conceded he could not determine the source of Yersinia bacteria without examining the suspect food or water and taking a sample for a culture. Thus, OPI argues that because Schooley's medical expert made no effort to eliminate all alternative sources, there is no legally sufficient evidence of causation to support Schooley's claims.

## Schooley's Evidence

The record does not indicate a specific date when Schooley first noticed the symptoms of his illness. He testified, however, that he first felt ill when he was stationed on the DB II. At trial, Schooley stated:

Well, when I was on the DB II is when it started happening. I started—you know, I felt real bad. And I'd take a drink of water and it would make me sick instantly. And I went to the foreman on deck and he said it was dehydration, that he was supposed to get some Gatorade in because other people were complaining about not feeling good and he was telling me it was dehydration. He was planning on getting some Gatorade in, and I never seen it.

In response to further questioning, Schooley said he made these concerns known to his wife:

Q. Now, you mentioned you wrote to Carrie and you telephoned her about not feeling well. What—in what way were you not feeling well?

A. I was having real bad stomach troubles.

Q. Okay, were you losing any weight? Were you staying about the same?

A. No, sir. I was losing weight bad.

Schooley's wife, Carrie, a nursing school graduate, testified that after her husband started working on the DB II, he repeatedly complained to her about having stomach pains. She said her husband would say "he didn't know what it was but he just did not feel well." She said each time he came home, she noticed he was losing weight, that there was a change in his bowel patterns, and that these symptoms were in stark contrast to his healthy condition before he began working on the DB II.

In response to questioning on direct examination, Carrie Schooley testified:

Q. Okay. When did it start? When do you remember him beginning to tell you (t)hat [sic] he was not feeling well?

A. I can't give you specific dates, but it was after June.

Q. Okay. Can you relate it in reference to the work on the OPI? Before Lamar went on DB II he worked in the shipyard at Orange? Was he sick at that time?

A. No, sir.

Q. In June he went out offshore to work on the DB II? Is that correct?

A. Yes, sir.

Q. And how do you place in your mind that was the time when he started to complain about not feeling well?

A. Well, of course when he would come home we hadn't seen him, so the physical aspect was what I noticed first. But then the visits when he did come home, he told me he just didn't feel

right. And he complained of that every visit.

Q. Is there any question in your mind that he had any problems whatsoever physically before he got on the DB II?

A. No, sir.

Q. You are sure of that?

A. I'm sure of that, because initially he had a weight gain.

In response to questions on cross examination, Carrie Schooley testified:

Q. When did you first notice any (physical) problems, what month?

A. I can only tell you I remember this: He had gone to the new location and that was the DB II.

Q. What were the problems you noticed?

A. After he was on the DB II, he would come home, and this was progressive. I noticed he had a weight loss.

After Schooley returned to his home in Burnet, Texas, he continued to work as an electrician. He continued to complain of stomach pain, but he refused to see a doctor because he was the sole support of his wife (a paraplegic as a result of a swimming accident) and their child.

Q. Now tell me about how your problems progressed after you got back home. What was it? Did they stabilize? Did they get worse? What happened after you got home and got off that barge?

A. My stomach just kept bothering me, and the longer that I waited, the more it bothered me.

Q. Okay. Did it progressively get worse?

A. Yes, sir.

Finally, in May 1992, Schooley was in so much pain he could not stand up straight, and he was rushed to the V.A. Hospital in Kerrville, where the doctors removed a grapefruit-sized tumor and a portion of his small intestine.

At first, the doctors diagnosed Schooley's condition as cancer and told him and his family that he had only six months to live. About a week later, however, a laboratory analysis of a mass removed from Schooley's body was shown to have a culture positive for the bacteria Yersinia enterocolitica.

One of Schooley's former crew members, Joe Goss, testified that he served aboard the DB II for about a week in July 1991, and that during his stay on the vessel he and several other crew members became ill with gastrointestinal problems. Goss said he left the DB II because of a broken foot, but that he later talked to his former bunkmate, Steve Deacon, who reported that he (Deacon) had become so ill he had to return to shore. Goss further testified that one of the DB II's medics admitted to him that his (Goss') stomach problems most likely were caused by the water aboard the DB II.

Captain Grace, a maritime consultant and surveyor with extensive experience in vessel operation and maintenance, testified that drinking water tanks on board marine vessels should be cleaned a minimum of once each year and that drinking water should be tested for contaminants every month. He also testified that hoses used to pump drinking water should never be used for pumping sea water or combined with fire hoses for pressure tests. He testified, without objection, that drinking water tanks on the DB II were cleaned only every 2 to 5 years, and that the DB II's records did not show that the drinking water had ever been tested to detect or eliminate contaminants. He further testified that the DB II's safety officer admitted the vessel's hoses used to pump drinking water had also been used for other purposes, such a washing down the decks, and that this practice improperly exposed the hoses to contamination from sea water. He additionally testified that his investigation of the DB II showed there had been no testing, checking, or other precautions taken to determine the safety of the water the DB II was receiving from supply ships. He was permitted to state his conclusion, without objection, that based on his investigation the drinking water aboard the DB II was "excessively" unsafe and that the failure to provide a supply of safe drinking water rendered the vessel unseaworthy.

**Schooley's Medical Testimony**

Dr. Roger Soloway, Director of the Gastrointestinal Division of the University of Texas Medical Branch in Galveston, Texas,

testified that: (1) Schooley had contracted Yersinia; (2) Yersinia can be contracted by drinking contaminated water; and (3) in his expert opinion, Schooley had contracted Yersinia by drinking contaminated water aboard the DB II.

Regarding his diagnosis of Schooley's illness, Dr. Soloway testified:

Q. Is there any better or more definitive test to determine whether a person has Yersinia enterocolitica than what was done for Mr. Schooley?

A. No. You can measure antibodies and things like this in the serum later or something of that nature. But the gold standard, as we like to call it, is the culture of the bacterium itself from the inside of the bowel and certainly from the lining of the bowel from the specimen that was taken in surgery. I can't think of anything better than that.

. . . .

Q. And did it show the presence of the bacteria, Yersinia enterocolitica?

A. That's correct.

Regarding the ways Yersinia can be transmitted, Dr. Soloway testified:

Q. Now, Yersinia enterocolitica, you mentioned is a bacteria. Can you tell us where it typically comes from, how one typically gets it?

A. Well, it's found in epidemics largely in terms of the way it's most definitely reported from both water and from food. Water sources are usually from streams or creeks or lakes. Food, a variety of food has been incriminated, but one most clearly incriminated is an epidemic that has been reported in chocolate milk among school children.

Q. So you mentioned food or water. Are those two things in which this bacteria reside where one acquires it through eating food or drinking water?

A. That's the most, by far the most common two sources.

Q. Of those two sources you mention, the most likely source is water.

A. Yes.

Q. And of water, are we talking about water that somebody would drink a glass of water in a restaurant that comes out of a faucet or are we talking water that might arise out of a vessel, whether it's a river, stream, Gulf, whatever it might be, are we talking about natural bodies of water, typically?

A. Yes.

As to the cause of Schooley's illness, Dr. Soloway was permitted to testify, without objection, that in his expert opinion and within a reasonable degree of medical probability, Schooley had acquired Yersinia from contaminated water aboard the DB II:

Q. Do you have an opinion as to where Mr. Schooley acquired that disease of Yersinia enterocolitica?

A. On the basis of historical information that I have been provided and on the basis of the picture at the time of the operation and an examination of the pathology, I think it's quite likely that he obtained this infection from contaminated water as this is the only viable source that I can see in his particular case.

Q. And do you have any opinion based upon the history and the clinical findings and the diagnostic tests and review of all the literature and medical records, where he acquired that contaminated water?

A. On the basis of what I have heard from—what I have not heard, but what I learned from the testimony of others who were on the boat, from the patient's wife's testimony, it appears that his symptoms started during the time he was on the boat, and so my logical extrapolation of that information is that he was exposed to contaminated water on the Drilling Barge II that he was employed on for a three month period of time.

Q. So it is your opinion, Doctor, that Mr. Schooley contracted the disease of Yersinia enterocolitica from contaminated water aboard the vessel DB II?

A. That's correct.

During cross-examination, Dr. Soloway expanded on this testimony, acknowledging that milk, milk products, meat, shellfish, and a variety of vegetables, as well as humans and animals had been implicated in the transmission of Yersinia bacteria. He further acknowledged that he had not tried to determine what foods Schooley had eaten or what water he had drunk, nor the places where he had eaten food and drunk water during the period of time he was assigned to the DB II and after he returned to his home in Burnet.

Although OPI initially contested Dr. Soloway's diagnosis that Schooley's tumor was caused by the Yersinia bacteria, that fact was not submitted to the jury and it is uncontested on appeal. Here, OPI contends only that the evidence shows Schooley could have acquired the Yersinia bacteria by eating or drinking in any number of places, or even by coming in contact with humans or animals during the time while he was assigned to the DB II and thereafter when he returned home to Burnet. Thus, OPI asserts that the evidence is legally insufficient to prove that Schooley contracted the bacteria from contaminated water supplied by the DB II. In essence, OPI argues that Dr. Soloway's testimony establishes nothing more than one "possible" source of the Yersinia bacteria and that Dr. Soloway's testimony and expert conclusion must be disregarded because he failed to eliminate all other possible sources of the Yersinia bacteria.

**Failure to Object to Reliability of Expert Witness**

Since the date of submission of this case, the Texas Supreme Court has issued its opinion in *Maritime Overseas Corporation v. Ellis,* in which a majority of the Court held that when the reliability of scientific evidence is contested, the party objecting to such evidence must make timely objection to the evidence at trial in order to preserve error on appeal. 971 S.W.2d at 411. The Court reasoned that if an objecting party is allowed to wait until after the jury's verdict to object to the reliability of scientific testimony, the experts would be denied the opportunity to "pass muster" in the first instance and such a practice would "usurp the trial court's discretion as "gatekeeper." *Id.* However, when on the face of the record the scientific evidence lacks probative value, no objection is needed to preserve a sufficiency of the evidence complainant. *Id.* at 412. We note that no timely objection was asserted at trial regarding the reliability of Schooley's expert witness testimony.

**Standard of Review**

Under Texas law, when a reviewing court seeks to determine whether the evidence is legally sufficient, *i.e.,* more than a scintilla, to support a vital fact, the court may consider only that evidence that supports the jury's finding and must review the evidence in the light most favorable to the party in whose favor the judgment was rendered. In conducting this review, the court must indulge every reasonable inference deducible from the evidence in that party's favor. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Schaefer v. Texas Employers' Ins. Ass'n,* 612 S.W.2d 199, 201 (Tex.1980). In deciding whether there is more than a scintilla of evidence, the reviewing court must consider whether the evidence supporting the finding, as a whole, ' "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." ' *Havner,* 953 S.W.2d at 711 (quoting *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995)).

In a Jones Act case, there is a less stringent standard of review. In such a case, the jury enjoys complete discretion in deciding factual issues on liability, and if its findings are supported by "some evidence," its verdict must be upheld. *Ellis,* 971 S.W.2d at 406.

We have applied these different standards in our consideration of OPI's first two points of error challenging the legal sufficiency of the evidence to support the jury's verdict under the Jones Act and on the unseaworthiness claim. Having conducted this review, we conclude that the evidence supporting the jury's verdict is legally sufficient to support the jury's verdict under both theories.

**OPI's "No Evidence" Claims**

OPI contends that we should disregard Dr. Soloway's expert testimony on causation, because it is only speculative and conjectural

and is unsupported by reliable scientific evidence. Specifically, OPI argues that we should not give any probative weight to Dr. Soloway's testimony because he did not: (1) eliminate other potential sources of the Yersinia bacteria; (2) show that Schooley contracted the bacteria while aboard the DB II; and (3) determine whether any other persons had contracted the disease while aboard the vessel. OPI asserts that there is no probative evidence to support a finding that water supplied on the DB II was the source of the Yersinia bacteria causing Schooley's illness and that Dr. Soloway's expert testimony could not have been based on reasonable medical probability.

In support of this argument, OPI relies upon *Schaefer v. Texas Employers' Ass'n,* 612 S.W.2d 199 (Tex.1980). Although *Schaefer* is factually similar, there are several important differences that distinguish it from this case. In that case, as here, the jury needed scientific guidance to better understand the nature of the claimant's illness and how the contaminating bacteria had likely been transmitted to the claimant. In *Schaefer,* the claimant failed to establish with reasonable medical probability either such element of scientific proof. The claimant's medical expert in *Schaefer* simply *assumed* that the claimant had been infected with a specific strain of bacteria, which he also *assumed* was present in bird droppings where the claimant worked. No evidence was offered to show the particular strain of bacteria that had infected the claimant, nor was it shown how the bacteria had likely been transmitted to him. Thus, the Texas Supreme Court held that the expert medical testimony did nothing more than suggest *one* possibility about how or when the claimant had been exposed to the disease. *Schaefer,* 612 S.W.2d at 204.

In this case, Dr. Soloway fully explained the nature of Schooley's illness and how the Yersinia bacteria had likely been transmitted to him. He testified, without objection, that he had diagnosed Schooley's illness as Yersinia because of the Yersinia bacteria found in the culture taken from Schooley's body. He then testified, again without objection, that this strain of bacteria typically has its source

in food or water, including natural bodies of water such as rivers, creeks, streams, or the Gulf. OPI has not seriously challenged Dr. Soloway's medical opinion on these matters, and his explanation of these matters is virtually undisputed.

Dr. Soloway further testified, without objection, that based on his patient's medical history and pathology, and upon the reports of others such as Schooley's wife and crewmembers, he concluded that Schooley had probably been exposed to water contaminated with the Yersinia bacteria during the three-month period he served on the DB II.

OPI argues that this conclusion is flawed because (1) Dr. Soloway did not exclude all other possible sources of the Yersinia bacteria and (2) there is no direct proof showing the water on the DB II to have been contaminated with the Yersinia bacteria. We disagree for the following reasons:

■ First, Schooley was not required to disprove all *possible* sources of the Yersinia bacteria other than the water on the DB II. He was required only to prove that the water on the DB II was the more *probable* source. *See Hernandez v. Altenberg,* 904 S.W.2d 734, 739 (Tex.App.—San Antonio 1995, writ denied).

■ Second, we find legally sufficient evidence in the record, in addition to Dr. Soloway's expert testimony, to support the jury's implied finding that contaminated water on the DB II was the probable cause of Schooley's illness. We briefly review this evidence:

(1) Schooley's testimony that he became ill while serving aboard the DB II, that he felt ill after drinking water aboard the vessel, and that he and others aboard the DB II had complained to the vessel's operating staff.

(2) Schooley's wife Carrie's testimony that Schooley had been healthy before he started working aboard the DB II, that while Schooley was on the DB II, he repeatedly complained to her about feeling ill, that her husband had suffered a significant weight loss during the period he worked aboard the DB II, and that his bowel patterns had

changed when he returned home after working on the DB II.

(3) Captain Grace's testimony that the drinking water tanks aboard the DB II were cleaned only every 2 to 5 years, that drinking water should be tested for contaminants every month, but the DB II's records showed its water was never tested for contaminants, that hoses used to pump drinking water onto the DB II were used for other purposes, exposing the hose interior walls to contamination from sea water, that the DB II took on drinking water from supply ships without testing to determine if the water was contaminated, that these practices were substandard for the marine industry, and that the failure of the vessel operator to maintain a safe, uncontaminated supply of drinking water rendered the vessel unseaworthy.

(4) Joe Goss' testimony that he and several crewmembers became ill with gastrointestinal problems while serving aboard the DB II in July 1991, and that after he left the DB II because of his broken foot, his former bunkmate, Steve Deacon, reported that after Goss had left, he (Deacon) became so ill he had to return to shore. Goss also testified that while he was on the DB II one of the vessel's medical personnel told him that his (Goss's) stomach problems were most likely caused by the water.

Schooley's case obviously would have been stronger had he been able to offer direct evidence showing contamination of the DB II water supply during the time he served on that vessel. However, Schooley's own testimony and that of his wife and crewmembers was legally sufficient evidence, albeit circumstantial, to support a reasonable inference that Schooley probably had been exposed to the Yersinia bacteria while drinking water supplied by the DB II. Thus, we hold there is legally sufficient evidence, which is independent of and in addition to Dr. Soloway's testimony, to support the jury's implied finding that the cause of Schooley's illness was contaminated water on the DB II.

■ Third, contrary to OPI's contention, this case does not turn upon the reliability of expert medical testimony. In *Schaefer,* as well as the other cases relied upon by OPI, the claimant's proof was dependent solely upon the reliability of the scientist's expert conclusions. Here, the jury needed no scientific guidance except to the extent that Dr. Soloway provided help in understanding the nature of the Yersinia bacteria and the means by which it is typically transmitted. TEX.R. EVID. 702; *see also Angelina Cas. Co. v. Spencer,* 310 S.W.2d 682, 685 (Tex.Civ. App.—Beaumont 1958, writ ref'd n.r.e.) (expert testimony needed only insofar as subject matter requires scientific interpretation). In resolving the ultimate issue of causation, the jury was not bound by Dr. Soloway's expert conclusion on that issue. *See Gray v. Floyd,* 783 S.W.2d 214, 216 (Tex.App.—Houston [1st Dist.] 1990, no writ) (unless subject matter is one for experts alone, jury can accept or reject all or any part of expert testimony). The jury was entitled to consider *all* the evidence, including the testimony of Schooley, his wife, and former crewmembers, in deciding whether it was more probable than not that he had been exposed to Yersinia bacteria while drinking water supplied by the DB II.

■ Fourth, we consider OPI's appellate complaint regarding the reliability of Dr. Soloway's expert testimony to be precluded by the rationale of *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d at 411 (party contesting reliability of scientific testimony must object at trial; otherwise complaint is not preserved). Allowing contesting parties to delay objections until post-trial would deny expert witnesses the opportunity to "pass muster" before the trial judge who functions as "gatekeeper" of scientific evidence. *Id.* at 411.

We overrule OPI's first two points of error.

### Point of Error Six

### Adverse Inference Instruction

Over OPI's objection, the trial court included within its charge to the jury the following instruction:

If a party fails to produce evidence which is under its control and reasonably available to it and not reasonably available to the adverse party, then you may infer that the evidence is unfavorable to the party who could have produced it and did not.

OPI contends the trial court abused its discretion in submitting this instruction because (1) there was no testimony that OPI, its agents or employees intentionally or accidently destroyed the DB II medical log and (2) the undisputed testimony showed OPI did not have control of the medical log.

In a recent decision, the Texas Supreme Court commented that Texas jurisprudence provides "evolving remedies, sanctions and procedures for evidence spoliation" and held that improper conduct should properly be rectified within the context of the lawsuit, not by an independent cause of action. *Trevino v. Ortega*, 969 S.W.2d 950, 953 (1998) (further noting that trial judges have "broad discretion to take measures ranging from a jury instruction on the spoliation presumption to, in the most egregious case, death penalty sanctions").

Justice Baker, noting in his concurring opinion the "devastating effect" evidence spoliation can have on the administration of justice, sought to define the remedies available to trial courts to protect against the loss of relevant evidence. *Id.* at 954. We will restate Justice Baker's instructions insofar as applicable to the facts of this case.

A party may not subvert the discovery process and the fair administration of justice simply by destroying evidence of an adverse claim. *Id.* at 955. Thus, once a party has notice of a potential claim, that party has a duty to exercise reasonable care to preserve information relevant to that claim. *Id.* at 957. Because of this duty, a party who intentionally or negligently fails to preserve relevant information may be held accountable for the loss of such evidence. *Id.*

When a party believes the other party has improperly destroyed or discarded relevant evidence, it may move for sanctions or request a spoliation instruction. *Id.* at 954. Upon such a motion, the trial court must determine, as a preliminary legal issue, whether sanctions or a presumption is justified. *Id.* In making this legal inquiry, the court must consider: (1) whether the accused party had a duty to preserve the evidence; (2) whether the accused party negligently or intentionally spoliated evidence; and (3) whether the spoliation prejudiced the other party's ability to present its case or defense. *Id.* at 954–55. In making this latter determination, the court should look to a variety of circumstances, including the relevancy of the missing evidence, the harmful effect of the evidence, and the availability of other evidence to take the place of the missing information. *Id.* at 958. If, for example, medical records are lost or destroyed, the custodial party should offer some proof showing the contents of the missing records. *Id.*

If the trial court determines that a duty to preserve evidence exists and that there has been a breach of that duty, resulting in prejudice to the other party, the court then must consider what remedy is warranted by the circumstances of the case. *Id.* at 959. In choosing an appropriate sanction or in submitting a spoliation instruction to the jury, the court is accorded broad discretion. *Id.*

At trial, Schooley demanded that OPI produce the DB II's medical logs covering the period of time in issue. In response, OPI produced Cole, its corporate officer, who testified that (1) when OPI first became aware of Schooley's claim, he had made diligent search for the medical log but had been unable to find it and (2) that "many records" had been removed from the DB II when it went to West Africa in December 1991, and later when OPI merged with its successor company in January 1995. Cole also testified that he had not told anyone to destroy the log. On cross-examination, Cole said he did not think it curious or unusual that OPI had retained all DB II logs except the medical log covering the period of time in question.

As a general rule, a party's failure to produce evidence within its control raises the presumption that, if produced, it would operate against him. *Brewer v. Dowling*, 862 S.W.2d 156, 159 (Tex.App.—Ft. Worth 1993, writ denied) (rule applies only when adverse party has introduced harmful evidence that unproduced evidence might re-

but); *H.E. Butt Grocery Co. v. Bruner*, 530 S.W.2d 340, 343 (Tex.Civ.App.—Waco 1975, writ dism'd). OPI recognizes this general rule, but argues that the presumption does not apply in this case because the undisputed testimony shows that the medical log was not in OPI's control. We disagree. The evidence shows that OPI was the legal custodian of the DB II's official records, including the medical log, and there was no showing of any change in custodial status that would have relieved OPI of its responsibility to preserve this evidence for trial.

OPI next argues that the trial court abused its discretion in giving the spoliation instruction because "the spoliation rule applies only when evidence has been *intentionally* destroyed, not merely lost." In support of this contention, OPI cites *Brewer v. Dowling*, 862 S.W.2d 156 (Tex.App.—Ft. Worth 1993, writ denied) and *Williford v. Submergible Cable*, 895 S.W.2d 379, 380 (Tex.App.—Amarillo 1994, no writ).

We find neither of these cases to be controlling in the case at bar. In *Brewer*, the appellate panel (with one justice dissenting) held that (1) the trial court had not abused its discretion in *refusing* to give the spoliation instruction because there had been no showing the missing data would have been unfavorable to the defendants (2) there was other reliable evidence available to the plaintiff and (3) there was no evidence that the defendants, either *intentionally or accidentally*, had destroyed the missing data. *Brewer*, 862 S.W.2d at 159–60. Thus, the *Brewer* case stands only for the proposition that a spoliation instruction is not justified in the absence of evidence showing (1) the harmful nature of the missing evidence (2) whether there was other evidence available that was cumulative of such proof and (3) the culpability of the defendants regarding the loss of such data. *Id.* at 159–60 (court expressly noted that it was not deciding whether the presumption arises in the absence of intentional destruction of evidence). Similarly, in *Williford*, the appellate panel held that the trial court had not abused its discretion in *refusing* to give a spoliation instruction, concluding that the missing items were not direct evidence and that because the evidence

had simply been lost, the spoliation instruction would not be an appropriate remedy. *Williford*, 895 S.W.2d at 389–90.

■ A trial court has broad discretion in instructing juries about the spoliation presumption. *Trevino v. Ortega*, 969 S.W.2d at 953 (citing *Watson v. Brazos Elec. Power Coop., Inc.*, 918 S.W.2d 639 (Tex.App.—Waco 1996, writ denied)); *see also, Thomas v. St. Joseph Hosp.*, 618 S.W.2d 791, 798 (Tex. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) (discretion in denying spoliation instruction not abused, even when relevancy shown); *Ordonez v. McCurdy*, 984 S.W.2d 264 (Tex.App.—Houston [1st Dist.] 1998 no pet.) (discretion not abused in denying spoliation instruction where evidence showed log books were disposed of pursuant to company policy and missing data not shown to be harmful). In exercising its discretion, the trial court must consider the individual facts of the particular case. *Trevino*, 969 S.W.2d at 953.

In *Watson v. Brazos Electric Power Coop., Inc.*, 918 S.W.2d 639 (Tex.App.—Waco 1996, writ denied), as in this case, the defendant had failed to preserve direct evidence relevant to the plaintiff's suit even though he was aware of the plaintiff's potential claim. The appellate court, in a per curiam decision, held the trial court had abused its discretion in refusing to give the spoliation instruction, even though the plaintiffs' attorney had been permitted to argue the adverse inference during the jury arguments. *Id.* at 643.

■ When a trial court is called upon to decide whether a party should be held accountable for the wilful or negligent loss of relevant evidence and to determine whether the other party has been prejudiced by such loss, the court may have to conduct a preliminary hearing to obtain the parties' testimony regarding the reasons for the unavailability of the evidence, the importance of the missing evidence, and the availability of other cumulative proof. *Trevino*, 969 S.W.2d at 954 (this preliminary hearing may involve questions of fact as well as law). If the trial court, after hearing such testimony, determines that the accused party had a duty to preserve evidence, which it breached either negligently or intentionally, and that the loss

of the evidence will prejudice the other party, the court then, in the exercise of its discretion, must decide whether the submission of a spoliation instruction is a proper remedy. *Id.* at 960.

■ In this case, the trial court could reasonably have determined from the evidence before it that: (1) OPI was the legal custodian of the DB II's records, including its medical log covering the period Schooley served on the vessel; (2) OPI had not given a satisfactory account of its efforts to preserve the medical log after being placed on notice of the relevancy of the record; (3) the missing medical log was relevant and highly important to Schooley's case, because it might have contained evidence to rebut OPI's testimony that there had been no water problems or gastronomical complaints on board the DB II during the period of time in question. In making this determination the court was entitled to consider:

(1) the testimony presented by OPI witnesses denying awareness of water problems aboard the DB II or any complaints by its employees of gastrointestinal illness during the period of time in question;

(2) the fact that OPI had been able to produce *all* DB II logs except the medical logs that would possibly have supported Schooley's claim;

(3) the testimony of Captain Grace that the missing medical logs were important documents and that he was surprised OPI was unable to explain their absence; and

(4) that the same corporate officer (Cole) who testified about the missing logs also testified that OPI's "lost-time" accident reports showed that no other complaints had been received regarding the condition of the water on the vessel.

It was OPI's burden to persuade the trial court that it had exercised reasonable diligence to preserve the DB II's records after being appraised of potential adverse claims. The trial court was entitled to accept or reject OPI's testimony regarding the degree of its culpability for the loss of such evidence and about the prejudice to Schooley caused by such loss. Based on the record before us, we perceive no basis for overturning the trial court's determination about such matters, and we further conclude that the trial court did not abuse its discretion in submitting the spoliation instruction to the jury.

We accordingly overrule OPI's sixth point of error.

## Point of Error Three

### Factual Sufficiency Complaint

As we earlier discussed under OPI's first two points of error, OPI failed to object at trial regarding the reliability of Dr. Soloway's expert testimony. Thus, OPI's factual sufficiency complaint regarding reliability of this scientific evidence was not preserved for review. *Ellis,* 971 S.W.2d at 411.

■ We also disagree with OPI's factual analysis of the record. Contrary to OPI's assertions, we find there is factually sufficient evidence to support Dr. Soloway's expert conclusion that Schooley likely contracted the Yersinia bacteria by drinking water supplied on the DB II. Schooley and his former crewmembers testified to the effect that several crewmembers became ill with gastrointestinal problems while serving aboard the DB II and that one of the vessel's medical personnel said their problems were most likely caused by the water. Although Schooley's proof of causation is circumstantial in nature and not exceptionally strong, the jury, sitting as the trier of ultimate fact, was entitled to accept his evidence as the more credible. Thus, we conclude that a fair-minded jury could reasonably have inferred from all the evidence, direct and circumstantial, that Schooley's illness was most likely caused by drinking water supplied on the DB II.

We hold the evidence to be factually sufficient to support the jury's verdict and that the jury's verdict is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

We overrule OPI's third point of error.

## Point of Error Four

### Excluded Personnel File

We next consider OPI's fourth point of error in which it asserts the trial court abused its discretion in refusing to admit into evidence a page from the personnel file of Steve Deacon, a former crewmember on the DB II, which contains a notation dated September 12, 1992, that recites: "Food offshore upset his stomach."

The admission and exclusion of evidence is committed to the trial court's sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995). For the admission or exclusion of evidence to constitute reversible error, an appellant must show that (1) the trial court committed error and (2) the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP. P. 44.1(a); *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992).

OPI contends that Schooley's evidence does not show when Deacon went ashore or when Goss had the alleged conversation with Deacon. OPI argues that the excluded evidence was relevant to the cause of the stomach problems of the crewmembers of the DB II and particularly because it was direct evidence as to the cause of Deacon's illness while aboard the DB II.

OPI points to the testimony of Joe Goss who testified as a witness for Schooley. Goss testified that Deacon was his roommate while both served aboard the DB II in July 1991 and that after Goss had left the boat, he was told by Deacon (who had remained on board) that while he (Deacon) was still working for OPI, he was so sick he had to be taken off the boat and that he no longer worked for OPI because he kept getting so sick and he wanted to return to shore.

After Goss testified, OPI offered Deacon's personnel file, which contained the notation: "Food offshore upset his stomach." The entry was dated September 12, 1992. Schooley's counsel objected to the offer, asserting that the file was irrelevant because it referenced an event that occurred a year after Schooley served on the DB II. The trial court sustained the objection and excluded the

proffered exhibit. On appeal, OPI argues that the excluded file was relevant on the following points:

(1) It tended to refute Schooley's theory that Deacon's problems (and other crewmembers' problems) were related to water supplied on the DB II.

(2) It supported the testimony of OPI's witnesses that no crew member became ill from drinking the water and that some of the crew suffered from indigestion as a result of food served offshore.

(3) It revealed a flaw in Dr. Soloway's "logical extrapolation" that complaints of illness implicated the water supplied on the vessel.

(4) It supported OPI's medical testimony that it was impossible, under the state of the available evidence, to implicate the water on the DB II as the source of Schooley's gastronomical complaints.

Thus, OPI argues that the evidence was relevant to the issues in question and that the trial court's exclusion of the personnel file was an abuse of the trial court's discretion. This error, OPI further claims, was harmful to the extent that a new trial is warranted.

We overrule OPI's fourth point of error, concluding that the trial court did not abuse its discretion in excluding the evidence. Goss testified that he served on the DB II in July 1991 and that he was forced to leave after about a week because he broke his foot. He said that he and his bunkmate Deacon both became ill with stomach problems during that time and that several other crewmembers also complained of stomach illnesses. OPI did not seek to cross-examine Goss about the specific time period in which Goss testified he, Deacon, and the others served together aboard the DB II. Instead, OPI later tried, after all witnesses had been questioned, to offer an entry made in Deacon's personnel file that Deacon had suffered a stomach illness a year later. The trial court did not abuse its discretion in deciding that the entry was too remote to be relevant to the inquiry at hand.

We overrule point of error four.

## Point of Error Five

### Loss of Future Earnings Instruction

■ In its fifth point of error, OPI contends the trial court erred in refusing to submit OPI's tendered instruction that damages awarded for loss of future earning capacity would not be subject to income tax. We decline Schooley's invitation to hold the point has been waived, and we proceed to consider the point on its merits.

OPI asked the trial court to submit the following instruction regarding loss of future earnings:

> If you find Lamar Schooley is entitled to an award of damages for loss of future earnings, there are two particular factors you must consider. First, you should consider loss after income taxes; that is, you should determine the actual or net income that Lamar Schooley has lost or will lose, taking into consideration that any past or future earning would be subject to income taxes. *You must award Lamar Schooley only his net earnings after tax. This is so because any award you make here is not subject to income tax. The federal or state government will not tax any amount which you award on this basis.*

(Emphasis added). The trial court refused to submit the emphasized part of the requested instruction and instead submitted the following over OPI's objection:

> If you determine that plaintiff is entitled to any award for loss of past earnings and/or loss of future wage earning capacity, you should determine the amount that plaintiff is entitled to receive without considering the effect of taxes upon it.

OPI complains that the submitted instruction is inconsistent with federal maritime law, which requires that the jury be advised of the nontaxability of an award of past or future earnings. *See Texaco Refining v. Estate of Dau Van Tran*, 808 S.W.2d 61, 64 (Tex.1991) (reversible error for trial court's failure to award damages consistent with maritime law); *Allred v. Maersk Line, Ltd.*, 35 F.3d 139, 142 (4th Cir.1994) (reversible error to refuse instruction in Jones Act case that plaintiff not required to pay state or federal taxes on award); *Norfolk & W. Ry. v.*

*Liepelt*, 444 U.S. 490, 498, 100 S.Ct. 755, 759, 62 L.Ed.2d 689 (1980) (error to refuse to instruct jury in FELA case that award would not be subject to income taxes).

We overrule OPI's fifth point of error. In both of the federal cases cited by OPI, the trial court failed to give the jury any cautionary instruction regarding the nontaxability of the awards. Here, the trial court instructed the jury to determine the amount of the award "without considering the effect of taxes on it."

In this case, as distinguished from *Liepelt*, there was no attempt by OPI to show what Schooley's projected earnings, after taxes, would have been, and therefore, there was no evidence that might have misled the jury about the extent the award would or would not be taxable. Although the instruction given by the trial court was not as specific as OPI's requested instruction, OPI has failed to demonstrate that the trial court's ruling was so erroneous the jury was misled thereby and that Schooley was overcompensated as a result. Thus, we find no basis for holding that the trial court abused its discretion in submitting the instruction to the jury.

## Point of Error Seven

### Prejudgment Interest Complaint

In its seventh point of error, OPI contends the trial erred, as a matter of law, in awarding prejudgment interest on the amount of the entire judgment. In support of this contention, OPI argues that Schooley's entitlement to prejudgment interest is determined by federal, not state law, and that under maritime law, the decision to award prejudgment interest is solely within the province of the jury. Because the issue of prejudgment interest was not submitted to the jury, OPI asserts the claim for prejudgment interest was waived.

■ OPI is correct in its assertion that prejudgment interest is not recoverable in a Jones Act case. *Maritime Overseas Corp. v. Narvaez*, 728 S.W.2d 924, 926 (Tex. App.—Houston [1st. Dist.] 1987, no writ). In addition, in a case tried to a jury under general maritime law, prejudgment interest

can only be awarded by the jury. *Maritime Overseas Corp. v. Waiters*, 923 S.W.2d 36, 45 (Tex.App.—Houston [1st Dist.] 1995) *aff'd as modified on other grounds*, 917 S.W.2d 17 (Tex.1996). We decline Schooley's invitation to affirm the trial court's award of prejudgment interest based on equitable principles and general state law. *See id.* at 44 (seaman's right to prejudgment interest governed by federal, not state law). Thus, even though the jury apportioned Schooley's damages between his Jones Act and maritime claims, we hold there is no legal basis to support the trial court's award of prejudgment interest. Accordingly, we sustain OPI's seventh point of error and order the judgment modified to delete the award of prejudgment interest.

### Point of Error Eight

### Double Recovery Complaint

In its eighth and final point of error, OPI contends the trial court erred in submitting damage question number 3(h), which resulted in a jury award of $50,000 to Schooley on his claim of loss of, and inconvenience to, the normal pursuits and pleasures of life. OPI argues that the submission of this issue, over its objection, resulted in a double recovery for Schooley because the elements of "inconvenience to the normal pursuits and pleasures of life" were simply constituent elements of damages for pain and suffering, which were the bases for a separate award of damages.

We overrule this point of error. OPI's objection to the trial court's instruction was that the "inconveniences on the normal pursuits and pleasures of life" constituted a double recovery because these elements were constituent elements of mental anguish damages (as opposed to physical pain and suffering damages). Although OPI argues that the distinction between "mental anguish" damages and "physical pain and suffering damages" is irrelevant because its objection was that the issue, as framed, would permit a double recovery, we cannot say that OPI's objection clearly identified the alleged error and adequately explained the basis for the complaint. Thus, we hold that the complaint was waived by the failure to make a specific objection to the charge. *See Allen v. American Nat'l Ins. Co.*, 380 S.W.2d 604, 608–09 (Tex.1964).

### Ruling of Court

We modify the trial court's judgment insofar as it awards prejudgment interest to Schooley so as to delete that award from the judgment. As so modified, we affirm the judgment.

TAFT, J., concurring.

TAFT, Justice, concurring.

Regarding the trial court's submission of a jury instruction on spoliation challenged in point six, I respectfully disagree with the majority that this was not error.

Generally, two rules apply to presumptions that arise from the nonproduction of evidence. *Wal-Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468 (Tex. App.—San Antonio 1998, n.p.h.). One rule is that the deliberate spoliation of evidence relevant to a case raises a presumption that the evidence would have been unfavorable to the cause of the spoliator, but, when there is no evidence of deliberate destruction, this rule does not appy. *Id.* Here, the majority apparently *draws inferences* of destruction from the fact that OPI had been able to produce all DB II logs except the medical log. Because *no* evidence of deliberate spoliation was produced, however, I would hold that the trial court erred by instructing the jury on the unfavorable-evidence presumption under this first rule.

The second rule is implicated when the party is in control of relevant evidence and it fails to produce the evidence or offer testimony explaining its nonproduction to rebut its opponent's harmful evidence. *Id.* In the present case, the majority relies on (1) evidence that OPI was the legal custodial of the DB II's official records and (2) the lack of any showing of a change in the custodial status to relieve OPI of its responsibility to preserve this evidence for trial. However, OPI's corporate officer, Cole, testified that he could not find the medical log when OPI first became aware of the claim. In the

absence of any evidence that OPI was in control of the relevant evidence when it was requested, I would hold that Schooley was not entitled to the instruction.

For harmful error to occur, the error must amount to such a denial of a party's rights that it probably caused rendition of an improper judgment. *See* Tex.R.App.P. 44.1(a)(1). Even though the issue, to which the missing log was relevant, was hotly contested, Schooley would have been entitled to argue spoliation even without the instruction. Admittedly, the fact that only the medical log turned up missing provided fuel for such an argument. Thus, while I would hold that the trial court erred in submitting an instruction on spoliation, after considering the record as a whole, I would not hold that error was so harmful as to have deprived OPI of a fair trial.

Accordingly, I concur in the majority's *judgment and in all other respects join the* majority opinion.