**MAULDING v. NIEMEYER.**

No. 4805.

Court of Civil Appeals of Texas.
El Paso.

June 20, 1951.

Rehearing Denied July 25, 1951.

Woodville J. Rogers and Geo. R. Thomson, both of San Antonio, for appellant.

Church & Church, and Wm. C. Church, Jr., all of San Antonio, David R. White, Uvalde, for appellee.

McGILL, Justice.

This is an appeal from an order of the District Court of Uvalde County, 38'h Judicial District, overruling the defendant, John H. Maulding's plea of privilege to be sued in Bexar County, the county of his residence.

Plaintiff in the trial court, appellee here, seeks to maintain venue in Uvalde County, under Section 7 of Article 1995, Vernon's Ann.Civ.St., because of alleged fraud com-

mitted in Uvalde County. The trial was to the court without a jury and no findings of fact or conclusions of law were requested or filed. The fraud alleged in plaintiff's original petition, paragraphs 1 to 7, is that relied on to sustain the order. This petition was incorporated in and made a part of plaintiff's controverting plea. We reproduce the material paragraphs:

"I. That prior to March 25, 1949, Plaintiff was the owner of 730 acres of land, more or less, in Uvalde County, Texas, as more fully described in deed dated November 5, 1948, recorded in Vol. 110, page 36 of the Deed Records of Uvalde County, Texas, and Defendant was the owner of approximately 919.6 acres of land adjoining said lands owned by Plaintiff, as described in deed dated December 4, 1947, recorded in Vol. 108, page 29 and deed dated January 12, 1948, recorded in Vol. 110, page 447 of the Deed Records of Uvalde County, Texas.

"II. That on said 25th day of March, 1949, and for sometime prior thereto the said Defendant represented himself to Plaintiff as a real estate broker and promoter. Said Defendant proposed that Plaintiff and Defendant subdivide their respective properties into small tracts and that said Defendant would find buyers for the lands. Under the agreement between Plaintiff and Defendant, Plaintiff was to clear roadways through the various properties, construct a house on same and remain on the premises to show the various tracts to purchasers whom Defendant would send to look at the property. Defendant agreed to send buyers to look at the property and all Plaintiff was to do was to show the property to them. In furtherance of this agreement, Defendant conveyed 51.2 acres of his land to Plaintiff for the sum of $10,-000.00 as shown by deed dated March 25, 1949, recorded in Vol. 110, page 446 of the Deed Records of Uvalde County, Texas.

"III. Said Defendant represented to Plaintiff that he could and would sell said 51.2 acres of land to various buyers for at least $200.00 per acre, and that Plaintiff's ownership of said 51.2 acre tract would enhance the value of Plaintiff's other lands and greatly facilitate the sale of said other lands by Defendant.

"IV. Plaintiff alleges that in compliance with said agreement and relying upon the representations and promises made to him by Defendant, Plaintiff purchased said 51.2 acres of land for $10,000.00, built a house on the lands and cleared and graded roads on both Plaintiff's and Defendant's lands and also cleared underbrush from said lands, his total expenditures in this connection amounting to more than $5,000.00. And relying further upon said representations and promises Plaintiff went to said property daily and remained there from early in the morning until night, for the purpose of showing same to buyers whom Defendant had promised to send to look at the property, such action on his part continuing for more than fourteen (14) days. Plaintiff also made many trips to San Antonio to discuss the various matters with Defendant.

"V. That the promises and representations made by Defendant to Plaintiff were falsely and fraudulently made by Defendant for the express purpose of inducing Plaintiff to purchase said 51.2 acres of land and to induce Plaintiff to clear said lands and fix roadways. That said Defendant had no intention of carrying out his part of said agreement and immediately after Plaintiff purchased said 51.2 acres, Defendant informed Plaintiff that he would have to sell the property himself as Defendant could not and would not do so. That Plaintiff would not have purchased said 51.2 acres of land, built said house, cleared the lands and roads, stayed on said premises, nor made said trips but for the promises and representations by Defendant.

"VI. That said lands, had Defendant carried out his promises and representations, would reasonably have been worth the sum of $93,440.00, which Defendant represented to be the value thereof; but said land was actually worth only $1,536.00, to Plaintiff's damages in the sum of $92,-904.00 plus the further sum of $5,000.00 expenses incurred by Plaintiff in clearing said lands and roads, plus the sum of $750.-

00 for the trips and time Plaintiff devoted to said agreement, a total of $98,654.00."

Appellant's points on which he relies for a reversal are in substance: (1) There is no evidence that any fraudulent promises were made by appellant; (2) No evidence of any intention not to perform any promises that were made at the time they were made, if they were made; (3) No evidence that appellee was damaged by the failure to perform any promises that were made, if they were made; (4 to 6) Implied findings, if any, that fraudulent promises were made; that there was an intention at the time not to perform any promises that were made; that appellee was damaged by any failure to perform any promises that were made are so against the great weight and the preponderance of the evidence as to be manifestly wrong. These points have, of course, required a careful reading of the Statement of Facts. We shall briefly summarize the evidence which we deem material.

In December 1947 appellant purchased some 1600 acres of land in Uvalde County, for part purchase price of which he secured a loan of $115,000.00 which was evidenced by a note secured by lien against the property. However, 100 acres of this 1600 acres was conveyed, free of the $115,000.-00 lien, to Mr. Frank Reeder, who had purchased other property adjoining the 1600 acres, and appellant executed a note for $10,000.00 which was secured by lien on this 100 acres, payable to Mr. Reeder. Apparently the purpose of this transaction was twofold—it was to serve as a bonus to Mr. Reeder for his services in procuring the loan of $115,000.00, and it was to enable appellant to show a clear title to the 100 acres, free of the $115,000.00 loan, in order to carry out his purpose of later developing it as a townsite. The first payment on this $115,000.00 loan, amounting to about $23,000.00 and interest of about $5,-000.00 became due on December 10, 1948. In October or November, 1948, appellant sold 730 acres of the 1600 acres to appellee for a consideration of $20,000.00 cash and the assumption of the payment of the $115,000.00 note. There was included in this 730 acres 48.8 acres of the 100 acre tract theretofore conveyed to Reeder, and subject to the $10,000.00 note lien. Immediately after this transaction appellant discussed with appellee his (appellant's) idea of developing a townsite upon the 100 acre tract, the first development to be located on the 48.8 acres which he had sold to appellee. It was tentatively agreed that a company would be organized and there would be conveyed to it the 100 acre tract of which appellee owned 48.8 acres and appellant owned 51.2 acres, at a price of $200.00 an acre, and that at the same time the company would develop a strip of their respective lands lying along the river. According to appellee's testimony appellant was to do all the selling in San Antonio and send the prospective purchasers to appellee, who was to remain on the property and show the lots or tracts into which the land was to be divided, to them. Appellee was to lay out roads on the property and build a house on his 48.8 acres to accomplish this purpose. Appellant said he knew he could sell the property, he had a moving picture advertising system which the company was to take over and use for advertising it. After this transaction there were numerous conversations between the parties which occurred on the property and in San Antonio. The appellee cut some roads on his 48.8 acres and built a house thereon on the strength of the proposed plan to develop the 100 acres as a townsite. Appellant kept telling appellee that he couldn't sell the property in his own name as well as in another person's name, and that he was going to sell it in his (appellee's) name, and that that was the reason he kept holding back and didn't want to organize the company. In March, 1949, appellant conveyed to appellee the 51.2 acres under circumstances as reflected by the following portions of appellee's testimony:

"A. Well, of course, first he was keeping his side and I was keeping mine, and we were to develop my side first and then his side. And he was reserving a strip about 300-ft. wide for his home for himself and he asked me to reserve a strip

about 300-ft. wide on my side for a home-site for myself on my acres.

"Q. Yes. And then what happened? Just tell us in your own words the details leading up to the purchase of the fifty-two acres. A. Then, of course, right about that time he slapped me on the shoulder and said I had a very big surprise coming in that day, he couldn't tell me what it was. Said, 'You wait and find out'. Of course, that was the aluminum boat with the cushions and what have you.

"Q. Well, I would still like for you to tell me, just in your own words, the entire chain of events leading up to your getting a deed to this property, or your signing a note for $10,000.00. A. Of course, it was like I said before. He was going to sell the lots in San Antonio and I was to receive the people on the property, and that, of course, was the reason I signed the note. And all I could see was buying food and clothes and making money through his selling the real estate.

"Q. Did he or not tell you anything at the time you signed the note? A. It jumped up on me rather sudden. We were in his car on the hill on the highway when he suddenly stuck this thing to me. I hesitated at the time to sign it because we were forming a partnership and he was putting his acres in at two hundred an acre and I was to put my acres in at two hundred also, and he politely informed me we would work out a deal on the rest of it and it would all be taken care of.

"Q. Why did you buy the fifty-two acres? A. Because he was going to sell the lots through this company that was to be organized.

"Q. You say he was going to sell the lots. What did he tell you, if anything? A. Well, I don't know if I can repeat his stories. He said, 'I have sold property from Main-- to California, from Canada to Mexico', he said 'I have never failed in a venture of this sort before. I know I can sell this.' And, 'Herbert, you are going to be sittin-- on top of the world,' and 'Do not be the oarsman of the boat but be captain of the boat'.

"Q. Is that why he wanted to sell the property to you? A. Well, he was still helping me after I signed the note for $10,000.00 on top of the hill, he was still selling the property for me, and of course, he was very sure he could sell it. He was very sure of himself that he could sell the property. Said he never failed in any venture of that sort.

"Q. Your testimony is here he said he would sell the property. A. Yes, sir.

"Q. At the time you discussed with Mr. Maulding this subdivision, did you or did you not at any time discuss any prices? A. You mean on the lots?

"Q. Yes. A. Yes, sir. He bought a tablet from me and he had me figure. I would always do the writing. He would tell me so many lots at so much money, this is what the total would bring.

"Q. What was the total? A. It is around, I would say, one hundred thousand dollars, $99,085.00, I believe it was. It was $665.00 times the number of lots listed on this map. That was what the hill was to bring. Of course, later on, the river was to bring in more.

"Q. That was on the hill? A. Yes.

"Q. Was that subsequent to, or prior to, the time you bought the fifty-two acres? A. Both. It was prior to and subsequent, too.

\* \* \* \* \* \*

"Q. At the time you purchased the fifty-two acres, did you, or did you not, have any conversation with Mr. Maulding in regard to the motion picture advertising? A. That, of course, had been his particular hobby all along and he had mentioned it from the first day I met him.

"Q. He had mentioned it? A. Yes, sir.

"Q. Did you have any conversation about that? A. Well, I don't remember whether it was conversation in regard to this picture advertising. But the conversation in regard to the other advertising came up, I imagine, almost weekly.

"Q. Weekly? A. Yes, sir.

"Q. I hand you Plaintiff's Exhibit 2 and ask you to state what it is, if you

know. A. This is the letter which Mr. Maulding gave us in regard to the $5,-000.00 for the picture advertising.

"Q. What date does it bear up there? A. March 24, 1949.

"Q. Do you recall offhand the date you signed the note for $10,000.00? A. I think it was on the 24th or 25th of March.

"Q. Then this was signed and the note was signed about the same time? A. Yes, sir.

"Q. Was there, or was there not, any discuss— about the motion picture advertising in regard to the subdivision? A. He was tryng to work the things together and he tried to get the company to take over the lot addition.

"Q. The company you were going to form? A. Yes, sir. He wanted to buy all the property there along the river for two hundred dollars an acre.

"Q. Well, this morning you heard Mr. Maulding testify to the fact that there was an agreement between the three people named on this Plaintiff's Exhibit 2 and himself, that this advertising was to advertise the lots. A. Well, he hadn't mentioned it. There was no agreement. In other words, he was going to sell the lots through advertising, and if the advertising didn't get started, he was going to do it himself, set up his own machine in the office.

"Q. Was the sale of this advertising copyright, or picture copyright, a separate transaction? A. Yes, sir. He tried to sell it to Bunyon Price, Kurt Meyers and myself before then, the picture advertising.

"Q. Not in connection with the subdivision? A. Yes, that was in connection with the subdivision.

"Q. At that time? A. Yes.".

It should be added that appellee's testimony shows that he was unable to meet the $23,000.00 payment due on principal and $5,000.00 payment due on interest on the $115,000.00 loan and that he was negotiating a sale of his property to a Dr. Rabel, that Dr. Rabel was unwilling to purchase unless he could acquire addition-

al acreage to that owned by appellee, and that during the latter part of December 1948 appellee, appellant and Mr. Reeder met in San Antonio and at Austin and arranged for a 90 day extension of the $115,-000.00 loan; that appellant agreed to transfer an additional 221 acres to appellee in order to enable him to close the trade with Dr. Rabel, that Dr. Rabel acquired an additional 163 acres and that this left appellee a tract of approximately sixty acres which appellant represented he would help appellee to sell. Appellee concedes that if there was any fraud in connection with this transaction it did not occur in Uvalde County and has no bearing on this venue hearing except insofar as it may be pertinent to the entire scheme of appellant to defraud him. The sale to Dr. Rabel was consummated and by this sale appellant was released of any lien for the $115,000.-00 loan on the remainder of his property. It also appears from appellee's testimony that appellant promised him that he would release the lien securing the $10,000.00 note on the 48.8 acres which was part of the hundred acre tract, whenever appellee should release the balance of appellant's land from the $115,000.00 loan lien.

 As said in Turner v. Biscoe, 141 Tex. 197, 171 S.W.2d 118, 119, (Com.App. opinion adopted): "The governing principles of law are familiar. A person's intention is a matter of fact. When a promise is made the promisor expressly or by necessary implication states that he then has a present intention to perform, and if such intention does not actually exist at that time, a false statement of fact has been made upon which fraud may be predicated. The gist of the fraud is deception as to an existing fact, namely, the state of the promisor's mind. That fact may be established by circumstantial evidence taken in connection with the breach, but cannot be established by the breach alone. The fact of breach, standing alone, does not even raise the issue of lack of intention to perform at the time the covenant was entered into. Chicago, T. & M. C. R. Co. v. Titterington, 84 Tex. 218, 19 S.W. 472, 31 Am.St.Rep. 39; Sisk v. Random, [Ran-

don] 123 Tex. 326, 70 S.W.2d 689; 14 Tex.Jur. p. 805, 806, Sec. 48; 23 Am.Jur., Fraud and Deceit, Sec. 38."

What "circumstantial evidence taken in connection with the breach" is sufficient to establish a fraudulent intention to deceive is the question left unanswered in most of the authorities cited in Turner v. Biscoe. In the cited case of Chicago, T. & M. C. R. Co. v. Titterington [84 Tex. 218, 19 S.W. 474] the court uses this language: "Whether the intention to cheat and defraud existed at the time of the making of the contract was a question of fact for the jury, and they might well have inferred that the railway company in fact had no intention at that time of establishing the depot on the plaintiffs' land, *from the fact that thereafter it did not even make a pretense of complying with the contract in this particular*. Dowd v. Tucker, supra [41 Conn. 197]." (Emphasis ours.)

It would seem from the language emphasized that the mere fact that the railroad, after making the contract, made no pretense of complying with it, was some evidence of its fraudulent intent at the time of making the contract. It is clear in this record that immediately after appellee signed the $10,000.00 note, he having theretofore negotiated a sale with Rabel, the effect of which was to release the remainder of the 1600 acres owned by appellant from the $115,000.00 loan lien, appellant exhibited no interest in attempting to sell the property. He admits that he had no intention of doing so. His explanation is that appellee and his associates had failed to put on the advertising campaign without which the property could not be sold. It occurs to us that the fact that appellant disposed of his moving picture advertising apparatus by a contract with appellee at about the same time that he deeded the 51.2 acres to him and procured his signature on the $10,000.00 note is a circumstance to be considered. The advertising campaign, according to appellant's own testimony, was the very lifeblood of any prospective sales of the property. Without such campaign even an experienced realtor who had sold property from "Maine to California and from Canada to Mexico" despaired of selling this property. The question at once presents itself, if appellant was sincere in his promise to resell, why did he part with this advertising paraphernalia which was essential and necessary to put on a successful advertising campaign, without which he could not sell? Why did he transfer such unique equipment to appellee and his associates who were inexperienced in its use in advertising either "rat skins or ranches" or townsite subdivisions? We think the sale, or attempted sale of the advertising equipment and paraphernalia is an important circumstance which tends to support the trial court's implied finding of fraudulent intention. In transactions of this kind (in real estate) the Legislature attempted to make failure to comply within a reasonable time with a promise to do some act in the future a prima facie presumption of fraud. Art. 4004, V.A.C.S. However, the legislative attempt to limit the nature of proof to rebut this presumption rendered this portion of the Statute unconstitutional. Clem v. Evans, Tex.Com.App., 291 S.W. 871, 51 A. L.R. 1135 (Com.App. holding approved). In accordance with the legislative intention and with the authorities we have investigated we think it safe to say that very slight circumstantial evidence of fraud, when considered with the breach of promise to perform some act in the future, is sufficient to support a finding of fraudulent intent in transactions within the purview of the Statute. All the circumstances surrounding this transaction were sufficient to support such implied finding here, and appellant's points to the contrary are overruled.

■■ It was not necessary in this venue hearing that appellee should establish the exact amount of his damages suffered because of the fraud. True, he did have to establish some damage as part of his cause of action, under Section 7 of Art. 1995. Campbell v. McCown, Tex.Civ.App., 176 S.W.2d 226.

The damages prescribed by the Statute is "the value of the property * * * as

it would have been worth had the promise been fulfilled, and the actual value of the property in the condition it is delivered at the time of the contract."

Appellant himself testified that he considered the 100 acres worth the $10,000.00 he paid for it for townsite purposes, and that as hill land it was worth only from $20.00 to $30.00 per acre. This testimony was sufficient to support an implied finding that appellee suffered some damage because of appellant's failure to perform his promise to sell the land for the contemplated townsite. All of appellant's points are overruled, and the order of the trial court is affirmed.