Jerald A. **TURBOFF**, Trustee, Appellant,

v.

Jenard **GROSS**, Appellee.

No. C14–90–0951–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 21, 1992.

Rehearing Denied June 18, 1992.

Dennis Herlong, Houston, for appellant.

Ronald E. Cook, Robert M. Roach, Jr., Solace H. Kirkland, Houston, for appellee.

Before ROBERTSON, SEARS and DRAUGHN, JJ.

## OPINION

DRAUGHN, Justice.

Jerald A. Turboff appeals from a directed verdict in his common law fraud lawsuit against appellee, Jenard Gross. The trial court ruled in appellee's favor by holding that appellee's alleged misconduct did not constitute a tort or fraud, but was a basic breach of contract action. In four points of error, appellant contends the trial court improperly directed a verdict against him because sufficient probative fraud evidence was presented. Further, he claims the court erred in applying an incorrect standard for fraud liability, in labeling his case as a mere breach of contract, and in determining appellee cannot be individually liable for his own misrepresentations when he acts on the corporation's behalf. We reverse and remand.

On December 24, 1985, appellant (Turboff), as trustee for a trust whose beneficiaries were Turboff, individually, Jerald A. Turboff, Inc., Turboff Investments, Inc., and Ronald Turboff, entered into a joint venture with United Savings (United) titled GP–175 Joint Venture (GP–175), which purchased approximately 175 acres of land in west Houston. Turboff owned 20% of the venture while United owned the remaining 80%. He financed his down payment by executing a note to United for $580,000. Afterwards, in January, 1986, Turboff, as trustee for Equinox Investment Co. (Equinox), purchased three separate parcels of land in Dallas County and Fort Bend County from United in a totally unrelated transaction.

In April, 1986, appellee (Gross), United's Chairman of the Board, and Gem Childress, United's Executive Vice–President, asked Turboff and his accountant, Bert Rosenbaum, to meet and discuss Equinox's January, 1986, land purchase down payment. Maintaining that United had miscalculated the necessary down payment, Gross asked Turboff to provide an additional $300,000 to enable United to book their $1.5 million profits according to applicable savings and loan regulations. Gross offered to let United do something for Turboff in return for this favor. Turboff expressed interest in selling back his 20% interest in GP–175. At the meeting's conclusion, Turboff and Gross agreed that Rosenbaum and Childress would continue negotiations and draft appropriate documents concerning the possible sale of Turboff's 20% interest in GP–175 in consideration for Equinox's additional $300,000 down payment.

Negotiations were conducted between April and June, 1986, mainly through Childress and Rosenbaum, by telephone conversations and at a meeting at United's office. Turboff suggested they use the same lawyers who represented them in the GP–175 negotiations. Claiming this was a simple deal between friends, Gross maintained the agreement could easily be put together by Childress and Rosenbaum. In May, all four parties discussed structuring the transaction so United would purchase 10% of Turboff's interest in GP–175 outright in consideration for Equinox furnishing $300,000. At a later point in time, Turboff would also have an option to sell back his remaining 10% interest.

In July, 1986, the following four separate letters constituting the parties' final agreement were prepared by Turboff and sent to United:

1. A June 4, 1986, letter providing for the disposition of Turboff's $300,000 Certificate of Deposit based on whether Equinox Investment Co. made a scheduled payment on January 2, 1987, for three property tracts

purchased from United. If the payment was made on time, the CD was to be released to Turboff on July 3, 1987. If the payment was not made, the CD was to be released to United on July 3, 1987.

2. A June 4, 1986, letter providing for the sale of 10% of Turboff's interest in GP–175 to United for a total sales price of $317,000. Since Turboff borrowed $580,000 from United to finance this down payment, United's purchase of Turboff's 10% interest reduced the note from $580,000 to $290,000.

3. A June 27, 1986, letter entitled "Turboff's option to sell remaining interest in GP–175 Joint Venture" giving Turboff an option to sell his remaining 10% interest to United by notifying United in writing between July 4, 1987, and July 31, 1987. This letter contained the following provision: "Notwithstanding any other provision of this letter, if the $300,000 CD pledged by Turboff is released back to Turboff prior to July 10, 1987, this entire option agreement becomes null and void (Notwithstanding Clause).

4. A June 30, 1986, letter detailing the modifications to the $580,000 note and letter of credit.

Three of the four letters displayed different dates because Turboff's secretary changed the dates each time Childress or Rosenbaum authorized subsequent revisions on a specific letter. The agreement was written in four letters instead of one single agreement so each aspect of the transaction could be dealt with individually. The four letters were all signed as one agreement at United's office on July 7, 1986.

When Equinox did not make the scheduled January 2, 1987, payment to United, the agreement terms authorized the release of the $300,000 CD to United on July 3, 1987. During a July 8, 1987, meeting between Turboff, Rosenbaum, and Childress, Turboff informed Childress he intended to exercise his option. When the meeting ended, Childress admitted he was confused about the letter's interpretation and would

contact them after he clarified its meaning with Gross. That same afternoon, Turboff received a letter from United stating they were releasing the $300,000 CD back to him pursuant to the June 27, 1986, letter terms and that his option to require United to purchase his last 10% interest in GP–175 was now null and void. Turboff and Rosenbaum set up a subsequent meeting with Gross and Childress to insist the agreement's option provision be honored. On July 24, 1987, Turboff attempted to exercise his option after asserting that United violated the option agreement by releasing the CD back to him. Gross dismissed the attempted option exercise and requested a meeting to review the agreement. Turboff, his counsel, Rosenbaum, Gross, and his counsel, Arthur Berner, met at United's office on July 31, 1987. Childress was not present because his employment had been previously terminated.

In his first point of error, Turboff alleges the trial court improperly directed a verdict against him because he presented adequate evidence of probative force that Gross committed fraud. For the reasons hereinafter discussed, we agree that the evidence was reflected sufficient to raise a material fact issue on common law fraud.

According to the Texas Supreme Court, the elements of actionable fraud are as follows:

(1) that a material representation was made;

(2) that it was false;

(3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion;

(4) that he made it with the intention that it should be acted upon by the party;

(5) that the party acted in reliance upon it; and

(6) that he thereby suffered injury.

*Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983). While a party's intent to defraud is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. Intent is a fact

question uniquely within the realm of the trier of fact because it depends upon the credibility of the witnesses and the weight to be given to their testimony. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986). Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Id.* at 435 (quoting *Maulding v. Niemeyer*, 241 S.W.2d 733, 738 (Tex.Civ.App.—El Paso 1951, orig. proceeding)). A written contract is a material representation. A party can base a claim of actionable fraud on a promise of future performance with a present intent not to perform. *Dodson v. Sizenbach*, 663 S.W.2d 13, 15 (Tex.App.—Houston [14th Dist.] 1983, no writ).

The task of the appellate court in a directed verdict case is to determine whether there is any evidence of probative force to raise fact issues on the material questions presented. *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978). The appellate court views all of the evidence in the light most favorable to the party against whom the verdict was instructed and discards all contrary evidence and inferences. *Qantel Business Systems, Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 303 (Tex.1988). When a trial court directs a verdict for a defendant, in order for the plaintiff to reverse the trial court's judgment, it is necessary for him to establish that the peremptory instruction cannot be supported on the grounds asserted by the defendant. *Dolenz v. Pulse*, 791 S.W.2d 572, 573 (Tex.App.—Dallas 1990, writ dism'd w.o.j.).

▪ In our case, the record reflects sufficient probative evidence to justify each of the elements constituting common law fraud. First, the June 27, 1986, letter, which constituted part of the written agreement, was a written material representation that Gross would buy Turboff's remaining 10% interest in GP–175 if Turboff exercised his option and notified United in writing between July 4 and July 31, 1987. Likewise, Gross admitted there may have been some discussion about buying out Turboff's remaining 10% interest in GP–175. He testified, "I think as a quid pro quo or something, it might have been that

we would buy back that 10% interest if he would do this." This discussion was an oral material representation that Gross would buy back Turboff's remaining 10% if he would give United the additionally requested $300,000. Next, these representations were false because United did not buy back Turboff's remaining 10% interest when he exercised his option.

Third, both Gross' and Childress' testimony indicate they knew the representation was false. When Turboff's counsel asked Gross whether the deal involved buying back Turboff's remaining 10% interest, he declared, "Never to my knowledge." Moreover, during the July 31, 1987, meeting, Gross announced that the entire transaction was done strictly as "window dressing for his auditors" so United could book their sale and he was only required to give Turboff back his $300,000 CD pursuant to the agreement's provisions. He claimed United had the right to return the CD to Turboff between July 3 and July 10, 1987, and thereby terminate his option rights. Gross' testimony discloses he did not intend to perform his part of the bargain at the time of the agreement. Additionally, when Turboff strived to exercise his option during the July 8, 1987, meeting, Childress pointed to the Notwithstanding Clause in the June 27, 1987, letter and informed him that United could override and nullify the option. Before this specific meeting, Childress had always maintained that the Notwithstanding Clause would only apply if Turboff made the January 2, 1987, payment to United on time.

The evidence also shows that Gross made this material representation to induce Turboff to provide the supplemental $300,000 down payment so United could book their profits from the January, 1986, land purchases. Childress testified that they intended for Turboff to rely on the promises in the letters. The record reveals Turboff did rely on the representation. Except for the opportunity to relinquish his entire 20% interest in GP–175, Turboff would not have entered into the agreement and given Gross the extra $300,000. Turboff only signed the letters and tendered the money to United *after* Childress signed each let-

ter. Both Rosenbaum and Childress testified that Turboff would not have concluded the agreement and relinquished the supplemental down payment money if he had known Gross would not fulfill his side of the bargain and would override the option plan. Finally, appellant suffered damages in the amount of $462,463.87 which included cost plus profit.

Gross contends he was not an active participant in the agreement because Childress handled all the details. We disagree. The evidence indicates that Gross was fully apprised of all negotiation details and approved and ratified the letters comprising the agreement. Gross and Turboff discussed provisions of the agreement several times on the telephone during the negotiations time period. Gross was designated to be the signatory on the contract. When Childress, Turboff, and Rosenbaum met to sign the agreement on July 7, 1986, Childress explained that Gross was out-of-town and assured them that Gross had fully reviewed the letters and authorized him to sign in his place. Notwithstanding that each letter was addressed to Gross, Childress struck through Gross' name on the letters' signature lines and signed each one himself.

Further, Childress sent Gross a confidential memorandum on May 22, 1987, recommending that United buy out Turboff's remaining 10% interest in GP–175. Childress stated that even though United would be paying Turboff a $300,000 premium for his interest, it was still a sound business move. He added that United would no longer be burdened with the GP–175 agreement terms limiting their options of staying or walking away from the project. On June 22, 1987, another memo titled "Real Estate Committee" which was signed by Childress, Gross and two other persons, discussed that the previous recommendation to buy out Turboff's interest in the GP–175 venture was no longer necessary because Turboff had subsequently agreed to take back his $300,000 CD instead. It is important to note that Childress later admitted during the trial that Turboff had not agreed to take back the CD rather than exercise his option agreement.

Gross asserts that he properly construed the agreement and that United's refusal to buy Turboff's remaining 10% interest was clearly within the agreement's terms. We disagree. We find there was sufficient evidence to raise a material fact issue of Gross' fraudulent intent and that a jury trial is necessary to evaluate and resolve this issue. It is proper for a trial court to grant an instructed verdict only when there are no material fact issues. *Dodson,* 663 S.W.2d at 15. Further, if there is any conflicting evidence of probative nature in the record, the jury is to determine the issue. *White v. Southwestern Bell Telephone Co.,* 651 S.W.2d 260, 262 (Tex.1983). Turboff's burden on appeal is to show that the directed verdict cannot be supported on the only *ground* asserted by Gross: that there is no probative evidence of fraud. Slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent. *Spoljaric,* 708 S.W.2d 432, 435. Viewing the evidence in the light most favorable to Turboff, we find there was adequate evidence to raise a material fact issue on fraud and that the trial court abused its discretion in granting a directed verdict in favor of Gross. Thus, we sustain Turboff's first point of error. As this issue is dispositive of the case, we need not address Turboff's other points of error.

Accordingly, we reverse the directed verdict granted in favor of Gross and remand the case to the trial court for proceedings consistent with this opinion.