# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00697-CV

**Nathaniel Aniekwu, Appellant**

**v.**

**Sean Daniels, Appellee**

**FROM THE COUNTY COURT AT LAW NO. 1 OF TRAVIS COUNTY
NO. 251,513, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING**

This appeal involves a business relationship that appellee Sean Daniels describes as a partnership and that appellant Nathaniel Aniekwu describes as nothing more than a contractor/subcontractor relationship. After the arrangement soured, Daniels sued Aniekwu. At the conclusion of vastly conflicting evidence, the jury found that (1) Daniels and Aniekwu had a partnership; (2) Aniekwu breached his fiduciary duty and duties of loyalty and care; and (3) Aniekwu committed fraud and conversion. Daniels elected to recover under his fraud and conversion causes of action. The trial court denied Aniekwu=s motion for judgment *non obstante veredicto* (AJNOV@) and rendered judgment on the jury=s verdict, ordering Aniekwu to pay Daniels $109,218.88[1] in compensatory damages and $50,000 in exemplary damages, plus prejudgment interest and costs.

---

[1] The $109,218.88 damage award consists of: $46,712.28 in compensatory damages for Aniekwu=s fraud, defined as the amount Daniels was to have received under the agreement less expenses he

saved by not fully performing; $60,000 in consequential damages, defined as lost profits and loss of credit that were natural, probable, and foreseeable consequences of Aniekwu=s fraud; and $2,506.60 for conversion damages.

## Sufficiency of the Evidence

We will first examine Aniekwu=s issues related to the sufficiency of the evidence. Aniekwu contends that the evidence is legally and factually insufficient to support the jury=s finding that he committed fraud or the award of exemplary damages and that no evidence supports the jury=s awards of $60,000 in consequential damages or $2,506.60 in conversion damages.[2] **Aniekwu further argues that the trial court erred in denying his motion for JNOV because there is no evidence to support findings that he entered into a partnership with Daniels or that he owed and breached a fiduciary duty or a duty of care or loyalty based on such partnership.**

### *Standard of Review*

**In performing a Ano-evidence@ or legal sufficiency review, we consider only the evidence and inferences that support a particular finding and disregard all contrary evidence and inferences.** *Sterner v. Marathon Oil Co.***, 767 S.W.2d 686, 690 (Tex. 1989);** *Simons v. City of Austin***, 921 S.W.2d 524, 527 (Tex. App.C Austin 1996, writ denied). In evaluating the factual sufficiency of the evidence, we review the entire record and set aside the finding only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust.** *Cain v. Bain***, 709 S.W.2d 175, 176 (Tex. 1986);** *Simons***, 921 S.W.2d at 527. The jury as fact-finder is the sole judge of witness credibility and the weight to be given the testimony.** *Simons***, 921 S.W.2d at**

---

[2] Aniekwu does not attack the $46,712.28 award for compensatory fraud damages.

**531.  We will not substitute our opinion for that of the jury when the verdict is sufficiently grounded in evidence.  *Id*.**

*Summary of the Evidence*

Because Aniekwu contests the sufficiency of the evidence to support findings of fraud and consequential and exemplary damages, a summary of the evidence is necessary.  The business relationship between Daniels and Aniekwu started in March 1997 and ended shortly after the 1999 Memorial Day weekend.  Daniels worked with Aniekwu on several projects, and although much of the evidence concerns the final project on which they worked together, Daniels=s contentions of fraud and damages encompass the entire two-year period of their business relationship.  The details of the business relationship were never memorialized in writing; all of their arrangements and agreements were oral.  Therefore, it was for the jury to hear Daniels=s and Aniekwu=s versions of their relationship and determine **the credibility of each version.**  *See id.*

Daniels testified that he started his own landscaping business in 1995, getting work through referrals and his church.  In March 1997, Daniels met Aniekwu, who was bidding on state landscaping projects and who also ran a gift shop in a local hotel.  Aniekwu and Daniels discussed working on a landscaping project at a state-owned nursing home on which Aniekwu was bidding; a third man, Al Brown, was also involved with the beginning of this project.  Daniels testified,

> I had my business going at that time, you know, so I don=t want to make no obligation or any commitment to anybody.  Me, [Aniekwu], and Mr. Al Brown, you know, came up with a decision, AOkay, we=re going to have a partnership, you know, so we=re going to

split the proceeds from this project.@ So that=s when we get together and went down to . .
. speak with the inspectors, and that=s how we obtained the first contract.

Daniels spoke to the state agency to assure the agency that Aniekwu=s team had Athe experience to do this type of project.@

Daniels testified that he invested time and materials worth $4,474.80 in the nursing home project. Daniels did not know what the overall contract price was and never received any of the proceeds. When he asked Aniekwu for his share of the proceeds, Aniekwu told him, AWell, this is chicken feed, you know. I have some other bigger contracts coming up, you know. Just let=s look at the big picture. We could use this to, you know, bankroll the other projects that [are] coming up.@ Daniels testified that he Aagreed to wait on getting [his] proceeds from the nursing home@ because Aniekwu promised that Asome bigger landscape contracts [were] coming up.@

In August or September 1998, Aniekwu contacted Daniels about bidding on a large project to mow the Texas Department of Transportation (ATxDOT@) right-of-way along highways in San Antonio (Athe San Antonio project@). Daniels did not mind that the San Antonio bid was submitted in Aniekwu=s name alone Abecause we had an agreement; and, plus, we had past dealings with one another. You know, and he owed me from the past.@ He said, AWe have an agreement of what each other is going to get out of it. I wasn=t trying to go into business with Nathaniel with the same company name. You know, I have my own company name. I=ve been established for a long time.@ Daniels said his understanding of the partnership was that Aniekwu would handle the business end, Adealing with the contracts and the inspector, and things of that nature.@

5

Daniels testified that he assisted Aniekwu in deciding how much they should bid and what equipment they would need for the San Antonio project. Aniekwu was to be in charge of the crew using mowing tractors and Daniels was to follow behind the tractors with a crew of weed eaters. To help finance the San Antonio project, Daniels helped Aniekwu on a small job in Laredo (Daniels said he and Aniekwu did not finish the Laredo project) and cut the grass and trimmed trees on Aniekwu=s rental property without compensation. Daniels testified that Aniekwu offered to buy him a truck so that Daniels could haul equipment. Daniels said, AYou know, I was going to get a trailer out of it, you know, and plus my service fees for being on the project.@ At the last minute, Aniekwu said he could not supply a truck, so Daniels repaired his old truck and used it during the first Acycle@ of the job. Daniels also bought four weed eaters for use on the project.

The San Antonio project was set to begin in April or May and was to be a two-year, full-time job, so with Aniekwu=s approval, Daniels left his other business and his moonlighting job at a convenience store Ato participate in this full time.@ Daniels told Aniekwu he could not afford to pay for the project materials, so Aniekwu agreed to pay for them. Daniels testified, AIf this was going to be a financial obligation to me, I wouldn=t take that risk. You know, it was promised me and all the employees everything was going to beCall expense was going to be paid by Mr. Aniekwu.@ He said, AAnd the only reason why I went into it, because I know I=m going to have guaranteed money coming from it and I also could use equipment, or else if I didn=t get that assurance, I would have never left my job and left my business alone.@ Daniels wanted to train the mowing crew in advance, but Aniekwu never arranged for such training before the project began.

The first mowing cycle started one day late and Daniels testified that work had to be stopped during the first cycle due to several different tractor-related problems, including having the blades on the tractors set too low, throwing up rocks and damaging passing cars; Aniekwu paid for the damage. Daniels said, A[I]t wasn=t organized. We had a good plan, you know, talking about the project before and what needs to be done, but when we went out there, it didn=t get executed the way it should be executed.@ Daniels intended to follow the tractors, but because of the tractor-related delays, he and his crew started weed eating on the other side of the highway. Although Aniekwu wanted to eliminate some of the weed eating crew, Daniels refused. Daniels said the weed eating took longer than usual, even with the extra laborers, because the grass was so thick.

Daniels testified that before the project began he warned Aniekwu that he had to go out of town over the Memorial Day weekend; the first cycle was supposed to be finished before Memorial Day, but ran late because of problems related to the tractors and other delays. Daniels left the Friday before Memorial Day and returned on Monday, thinking the crew would not work over the holiday weekend. On Tuesday, he returned to the project, put his crew to work, and asked Aniekwu for money for food and gas; Aniekwu said he did not have any money to give Daniels.

Daniels knew money would be tight early in the project, so he and Aniekwu asked some of the crew to accept being paid only at the end of the month. Even then, some laborers were not paid by Aniekwu, who made partial payments to some, with promises to pay more later, and shorted the pay of others. Aniekwu also fired some laborers to cut expenses. When some of Daniels=s crew quit because they had not been paid, Aniekwu found replacements, but Daniels said that hiring those men was Aa disaster.@

7

Daniels said, AI was trying to show them how to weed eat out there, and that=s when he [Aniekwu] took the other weed eaters from me, three weed eaters, plus one of my personal weed eater[s].@ Daniels testified that Aniekwu kept the weed eaters. Aniekwu eventually stopped returning Daniels=s calls, despite Daniels=s increasingly angry messages.

Because Daniels was promised that gas, food, hotel rooms, and expenses for the San Antonio project would be repaid, he paid for food and gas for himself and other crew members out of his own pocket. Daniels testified that he paid $1600 for the weed eaters that Aniekwu kept. According to Daniels, the full contract amount for the San Antonio project was $401,304.90 and Aniekwu was paid $44,098.95 for the first cycle; Daniels received a total of $400 for the San Antonio project and was never paid for his earlier work on the nursing home or other projects. Daniels testified that he incurred $99,812.06 in damages, including the weed eaters, labor fees, truck repairs, maintenance, operating expenses, and bankruptcy attorney=s fees. Daniels also testified that due to financial problems brought on by his dealings with Aniekwu, he was filed bankruptcy in August 1999. Daniels had intended to refinance his house, expecting to save about $26,000 in interest over the course of the new mortgage, but after he declared bankruptcy he was unable to obtain refinancing. He eventually got a job at a warehouse, where he still worked at the time of trial.

Ricky McGee, owner of Austin Outdoor Power, testified that he had done business with Daniels for four to five years. Daniels introduced Aniekwu to McGee as a Anew business partner,@ saying that they were Astarting some new avenues, looking into some State contracts and things of that nature. And I was introduced to Nathaniel, and Nathaniel was going to make most of the decisions, especially from a

8

financial standpoint of view for Sean and the company." McGee said Aniekwu and Daniels bought equipment with Daniels's existing business account. McGee was asked, "And it was apparent . . . that all the purchases they made were going to benefit their job, that both of them were working on as partners; is that correct?" McGee answered, "That is correct. It was a joint venture was my understanding." McGee said Daniels and Aniekwu indicated that their relationship was a joint venture and "asked to be able to use the Daniels'Landscape account that we had already had established," and said Aniekwu made most of the decisions about what equipment to buy. McGee said that before working with Aniekwu, Daniels kept his account in good standing, albeit with a few late payments. McGee thought that Daniels and Aniekwu over-extended themselves and that Daniels "was pretty much left with all the debt."

John Lindsey testified that he had known Daniels for a number of years. Lindsey testified, "Well, [Daniels] said he was going into business with this — with Nathaniel here, you know, cutting grass and stuff; they're trying to get some tractors and stuff." Lindsey agreed to operate one of the tractors for $500 or $600 a week, but Aniekwu paid him about $400 for the first and second weeks and then "[t]he last time I got paid was like 300 and something dollars, and I just — I never came back." Lindsey said Aniekwu kept reducing his pay until he quit.

Contrary to Daniels's assertions, Aniekwu denied telling Daniels that they would be partners. In his deposition, Aniekwu stated that he thought Daniels "did the work on the nursing home project out of the goodness of his heart"; at trial he testified that he paid Daniels for materials and that Daniels also brought some day laborers. Aniekwu explained that he only paid Daniels for materials because he understood that Daniels "would bring these guys, and drop them, and go to his own landscaping

9

business.@ Aniekwu testified, AI asked him several times again, >Tell me exactly what you want me to pay?= But he said not to worry about paying him.@ Aniekwu also agreed that he thought that Daniels mowed the lawn of Aniekwu=s rental property Aout of the goodness of his heart.@ Aniekwu said that Daniels=s role on the San Antonio project was as a subcontractor to help Aniekwu Aprocure or secure day laborers.@ Aniekwu testified that Daniels said he was too busy with his own work to do more than help get workers. Aniekwu testified that he understood that Daniels did not want or expect to be paid for his work on the projects, but only wished to be involved in the bidding process on the projects as a learning experience; however, he also testified that Daniels did not help prepare the bids for the nursing home or San Antonio projects. Aniekwu said that if Daniels expected to be paid for the San Antonio project, Daniels would have arranged to be paid by Aniekwu so that he could pay his weed eating crew himself instead of having Aniekwu pay the crew directly.

Aniekwu testified about TxDOT=s daily logs indicating when the right-of-way was mowed and any equipment or other problems that arose each day. Aniekwu denied that Daniels told him in advance about the Memorial Day weekend trip, and said that Daniels was absent from the Thursday before Memorial Day until the following Wednesday or Thursday. Although Aniekwu=s crew was contractually barred from working on weekends without permission, Aniekwu testified that he and his crew worked during that holiday weekend. When asked why the daily logs indicate that no work was performed over that weekend, Aniekwu stated, AI worked only on Saturday,@ and, APerhaps I got the permission to work, but he [the TxDOT inspector] didn=t want to reflect it as work being done that day.@ Other log entries indicate when Aniekwu=s crew attempted to work on weekends without permission. Although Aniekwu

10

alleged that Daniels=s weed eating crew moved too slowly, the logs do not reflect this; Aniekwu testified that it was too small a part of the project to be noted, but the logs do indicate problems with the weed eating crew falling behind schedule or performing the work improperly after Daniels left the project.

Aniekwu=s personal financial statement from 1998 indicated his net worth was about $333,000. He testified that as of the date of trial, he had received some $275,000 from the San Antonio project and that he was currently working on a $300,000 TxDOT contract for mowing in the Austin area and had been paid between $125,000 and $150,000 for that project. Aniekwu admitted that he Aalso took Sean=s [weed eaters] later.@

Huey Krauser testified that he had known Aniekwu for three or four years and briefly worked on the San Antonio project. He said that Daniels=s weed eating crew fell behind early in the project and that TxDOT often complained about the weed eating, sometimes several times a day.

Yvonne Williams testified that she had been friends with Aniekwu for about ten years. She met Daniels through her church and introduced him to Aniekwu. Williams testified that she helped Aniekwu prepare his bid for the San Antonio project and that Daniels was not involved in the process, other than being asked what he would charge to Abe a weed eating crew.@ Williams said Daniels was interested in the bidding process more than in making money on the project. Williams testified that she had reservations about using Daniels because he was not actively involved in landscaping but instead worked at a convenience store. She asked Aniekwu whether he had the terms of his agreement with Daniels in writing, but Aniekwu said, AOh, we=re friends. Don=t worry. This is going to be okay. We=re going to be able to work this through.@ Williams said Daniels never indicated that he wanted to be partners with Aniekwu.

11

*Does the Evidence Support a Finding of Fraud?*

In his fourth issue on appeal, Aniekwu argues that there is Awoefully insufficient evidence to show fraud.@ He also alleges that there is no evidence to support the various elements of fraud. We will read Aniekwu=s argument liberally and address both the legal and factual sufficiency of the evidence supporting the jury=s finding of fraud.

**The elements of fraud are: (1) a false material representation was made; (2) at the time the representation was made, the speaker either knew the representation was false or recklessly made it as a positive assertion despite having no knowledge of the truth; (3) the speaker intended that the other party would rely on the representation; and (5) the other party relied on the representation and suffered harm as a result.** *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.***, 962 S.W.2d 507, 524 (Tex. 1998). A promise to perform an act in the future amounts to fraud if the promise is made with the intention to deceive the other party and with no intention of performing the promised act.** *Spoljaric v. Percival Tours, Inc.***, 708 S.W.2d 432, 434 (Tex. 1986). The promissor=s intent is determined at the time the representation is made, but that intent may be inferred from the promissor=s behavior after making the representation.** *Id.* **Intent is a question of fact Auniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony.@** *Id.*

**A promissor=s failure to perform, standing alone, is not evidence of a fraudulent intent held at the time a promise is made, but that fact may be considered along with other facts to**

12

find such intent. *Id*. at 435. Because fraudulent intent generally is not susceptible to direct proof, it usually is proven by circumstantial evidence. *Id.* A>Slight circumstantial evidence= of fraud, when considered with the breach of a promise to perform, is sufficient to support a finding of fraudulent intent.@ *Id.* (quoting *Maulding v. Niemeyer*, 241 S.W.2d 733, 738 (Tex. Civ. App.CEl Paso 1951, orig. proceeding)). A party=s denial that he made the promise may indicate that he never intended to perform. *Spoljaric*, 708 S.W.2d at 435; *see also Stone v. Williams*, 358 S.W.2d 151, 155 (Tex. Civ. App.CHouston 1962, writ ref=d n.r.e.) (AWhile a mere failure to perform is not sufficient to prove the existence of an intention not to perform at the time the promise is made, where the party allegedly making the promise denies making the promise, there is sufficient evidence to support a finding that there was the absence of intention to perform when it was made.@).

Daniels testified that he believed he was entering into a partnership that would involve working with Aniekwu on the nursing home project, the San Antonio project, and future state contracts. McGee and Lindsey testified that Daniels believed he was partnering with Aniekwu for the San Antonio project and future projects. Daniels abandoned his own landscaping business and his moonlighting job at the convenience store to pursue the San Antonio project. Daniels agreed to let Aniekwu roll Daniels=s earnings from the nursing home project into the San Antonio project, helped Aniekwu in Laredo, and mowed the lawn of Aniekwu=s rental property. After Aniekwu refused to buy Daniels a truck, Daniels repaired his own truck for use in the project. Daniels paid for food, gas, and other project-related expenses, expecting to be repaid,

13

and used his credit to buy equipment and his business and personal contacts to staff the project. Daniels testified that he was driven into severe financial difficulties when his relationship with Aniekwu ended, eventually declaring bankruptcy. The evidence is legally sufficient to support the jury=s findings that a false material representation was made and that Daniels relied on that representation to his detriment.

Although some of Daniels=s testimony indicated that he intended to keep his business separate from Aniekwu=s, Daniels also testified repeatedly that he was led to believe that he and Aniekwu had a partnership arrangement. Aniekwu denied that the arrangement was a partnership, insisting that Daniels was merely a subcontractor hired to run the weed eater crew. Aniekwu argues that Daniels was already in financial trouble when the San Antonio project began to deteriorate. Aniekwu=s friend Williams likewise testified that Aniekwu did not tell Daniels that their working arrangement was a partnership and that Daniels was not involved in the bidding process other than giving a bid to subcontract the weed eater crew. Krauser testified that Daniels=s crew fell behind early and did not perform well on the project. However, the jury heard the conflicting evidence and found Daniels=s testimony more believable. The evidence is factually sufficient to support the jury=s findings of material misrepresentations and Daniels=s detrimental reliance on those misrepresentations.

As for Aniekwu=s intent at the time he made representations about the future of his business relationship with Daniels, Aniekwu denied making any such representations. Aniekwu testified that Daniels did not wish to be paid for his troubles, but instead worked on the nursing

home, Aniekwu=s rental property, and the San Antonio project either Aout of the goodness of his heart@ or to learn the ins and outs of bidding on state contracts.  However, Aniekwu also testified that Daniels was not involved in the bidding process.  The evidence is both legally and factually sufficient to support a finding that Aniekwu promised Daniels an on-going business partnership to obtain Daniels=s labor, contacts, and financial assistance and, when coupled with Aniekwu=s denial of such promises and his subsequent behavior, is legally and factually sufficient to support a finding of fraudulent intent.  *See Spoljaric*, 708 S.W.2d at 435.  We may not substitute our judgment for the jury=s determination of this issue, which rests so heavily on the credibility of Daniels and Aniekwu and their witnesses.  *Id.* at 434.  We overrule Aniekwu=s fourth issue on appeal.

*Does the Evidence Support the Consequential Damages Award?*

Aniekwu asserts that there is no evidence to support the jury=s award of $60,000 in consequential damages for fraud.[3]

**Under common law, actual damages can be either Adirect@ or Aconsequential.@** *Arthur Andersen & Co. v. Perry Equip. Corp.*, **945 S.W.2d 812, 816 (Tex. 1997). Direct damages flow directly from and are the necessary and usual result of a defendant=s wrongful act.** *Id*. **Consequential damages are the natural but not necessary results of a defendant=s wrongdoing.** *Id*. **Consequential damages must be foreseeable and directly traceable to and resulting from the wrong, but they need not be the usual result of the wrong.** *Id*. **Further, damages for loss of credit may be recovered if that harm is the usual or probable result of the defendant=s wrongful conduct.** *Connell Chevrolet Co. v. Leak*, **967 S.W.2d 888, 892 (Tex. App.C Austin 1998, no pet.). Loss of credit is compensable if a plaintiff is denied a loan or charged a higher interest rate.** *Id.* **Damages for loss of credit may not be clearly ascertainable, and the Adetermination of the amount is necessarily lodged in the discretion of the jury.@** *Id.* **Lost profits may also be recovered in a fraud suit.** *GTE Mobilnet of S. Tex. Ltd. P=ship v. Telecell Cellular, Inc.*, **955 S.W.2d 286, 294 (Tex. App.C Houston [1st Dist.] 1997, writ denied);** *see Trenholm v. Ratcliff*, **646 S.W.2d 927, 933 (Tex. 1983).**

---

[3] Aniekwu does not complain that the evidence is factually insufficient to support the consequential damages award.

16

**According to McGee, Aniekwu and Daniels together charged the weed eaters to Daniels=s business account**. Daniels testified that he told Aniekwu repeatedly that he needed money to pay bills, buy food and gas, and continue working on the project. Daniels testified that he left several messages for Aniekwu, eventually informing Aniekwu of his bankruptcy. As a result of his bankruptcy, Daniels was unable to refinance his home. Although Aniekwu argues that Daniels was in dire financial straits before beginning to work with Aniekwu, Daniels testified that before dealing with Aniekwu, he was Adoing good@ financially and his fledgling landscaping business was growing. As a result of his dealings with Aniekwu, Daniels abandoned his own landscaping business. The evidence supports a conclusion that Daniels=s difficulties were brought on, or at least exacerbated by, his failed dealings with Aniekwu. Further, Daniels believed that he was to be Aniekwu=s partner, sharing in the proceeds of the San Antonio project, and presumably participating in future projects. Of the $44,000 paid for the first cycle and between $275,000 and $400,000 paid for the entire project, Daniels received a mere $400; Aniekwu has since been awarded a second TxDOT contract, worth $300,000. Daniels was never paid for his work on the nursing home project, his assistance in Laredo, or his work maintaining Aniekwu=s rental property. The evidence is legally sufficient to support the jury=s award of $60,000 in consequential damages as a result of Aniekwu=s fraud. We overrule Aniekwu=s **challenge to the evidence supporting the award of consequential damages.**

*Does the Evidence Support an Award of Punitive Damages?*

17

In his sixth issue, Aniekwu argues that there is no evidence to support the jury=s award of exemplary damages because there is insufficient evidence to support the finding of fraud or malice. AA finding of intent to harm or conscious indifference to the rights of others will support an award of exemplary damages.@ *Spoljaric*, 708 S.W.2d at 436 (citing *Trenholm*, 646 S.W.2d at 933). A finding of Asome evidence@ of a fraudulent intent is Asome evidence of conscious indifference@ and will support a jury=s award of exemplary damages. *Id*.; *see Trenholm*, 646 S.W.2d at 933. Here, as discussed earlier, the evidence is sufficient to support the jury=s finding that Aniekwu committed fraud. Thus, there is Asome evidence@ to support the jury=s award of $50,000 in exemplary damages. *See Spoljaric*, 708 S.W.2d at 436. Although Aniekwu does not raise this contention, we further note that the award is not so excessive as to be unreasonable. *See Foley v. Parlier*, 68 S.W.3d 870, 881-82 (Tex. App.CFort Worth 2002, no pet.) (in examining reasonableness of exemplary damage award, amount of which Arests largely in the discretion of the jury,@ courts should consider nature and character of wrong, degree of culpability, situations of parties, and Apublic sense of justice and propriety@). We overrule Aniekwu=s sixth issue on appeal.[4]

*Does the Evidence Support the Award for Conversion Damages?*

Aniekwu=s fifth issue, in its entirety, reads as follows:

---

[4] Aniekwu also asserts that the evidence does not support the jury=s award of attorney=s fees. Although the jury found that Daniels was entitled to recover $41,000 plus further appellate attorney=s fees, Daniels did not request and the judgment does not award attorney=s fees.

18

V.   *There is insufficient evidence to support the jury=s findings of appellant=s exercise of control over the appellee=s property a fiduciary duty and resulting breach of a fiduciary meriting damages*

There is no evidence to support the answer to question 16.  There is insufficient evidence to support the answer to question 17 in that the precursors have not been proven.  Daniels showed neither fraud nor malice with the evidence that he presented.

This issue is not properly briefed.  Aniekwu does not include any reference to the record or to any authority, nor does he explain how the jury=s answers were improper or lacked support in the evidence.  *See* Tex. R. App. P. 38.1 (appellant=s brief must contain Aclear and concise argument@ with Aappropriate citations to authorities and to the record@); *Trenholm*, 646 S.W.2d at 934 (APoints of error must be supported by argument and authorities, and if not so supported, the points are waived.@).  **Aniekwu does not explain how the jury=s award of conversion damages (question 16) is erroneous or what Aprecursors@ are lacking.  By his failure to properly brief this issue, Aniekwu has waived this issue on appeal.  *See Trenholm*, 646 S.W.2d at 934.  Further, we have held that the evidence supports the jury=s finding that Daniels was harmed by Aniekwu=s fraud or malice (question 17).  We overrule Aniekwu=s fifth issue.**

*Aniekwu=s Remaining Sufficiency Issues*

**In his seventh issue on appeal, Aniekwu argues that his motion for JNOV should have been granted because the evidence does not support a finding of a fiduciary duty or fraud, and in his first three issues, he argues that there is no evidence to support the jury=s finding that he entered into a partnership with Daniels or that he owed and breached a fiduciary duty or a duty**

of care or loyalty. However, Daniels elected to recover under his fraud and conversion causes of action, and due to our determination that the evidence is sufficient to support the jury=s findings related to fraud, we need not address Aniekwu=s first, second, third, and seventh issues.

## Exclusion of Testimony

Finally, we address Aniekwu=s eighth issue, in which he contends that the trial court committed reversible error when it granted Daniels=s motion *in limine* relating to documents and testimony regarding Aniekwu=s financial situation. Because Aniekwu failed to produce any documentation related to the expenses he incurred as a result of the project, the trial court barred him from testifying about those alleged expenses and instructed the jury to presume that any Aevidence regarding the value of the alleged partnership@ would have been unfavorable to Aniekwu.

The admission and exclusion of evidence is left to a trial court=s sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). A trial court abuses its discretion if it acts without regard to any guiding principles or rules. *Id.* at 754. If a trial court finds that a party has negligently or intentionally allowed the spoliation of evidence, the court has broad discretion in imposing sanctions, ranging from a jury instruction to so-called Adeath penalty@ sanctions. *Trevino v. Ortega*, 969 S.W.2d 950, 953 (Tex. 1998); *Offshore Pipelines, Inc. v. Schooley*, 984 S.W.2d 654, 666 (Tex. App.CHouston [1st Dist.] 1998, no pet.). A party seeking to reverse a judgment based on a trial court=s exclusion of evidence must show that the exclusion was erroneous and that the error was Areasonably calculated to cause and probably did cause

20

rendition of an improper judgment.@ *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992). Although the complaining party need not prove that Abut for@ the erroneous exclusion the judgment would have been different, a successful challenge usually requires the complaining party to show that the judgment turns on the excluded evidence. *Alvarado*, 897 S.W.2d at 753-54. We review the entire record in making that determination. *McCraw*, 828 S.W.2d at 758.

Outside the jury=s presence, Aniekwu attempted to explain how he came to lose his records related to the landscaping business. For much of the time in question, Aniekwu operated a hotel gift shop in addition to his landscaping business. Aniekwu kept his business records related to the landscaping business in the gift shop and when the shop was closed, he neglected to retrieve the records. The records were left in the hotel=s possession for an extended period of time, perhaps as long as two years. Aniekwu testified that the hotel changed ownership, and he was told that his records and other property had been moved into storage and that the hotel Awant[ed] me to come and remove my items or goods.@ Despite being informed that his property would be stored for only ten days, Aniekwu did not retrieve his records but referred the hotel to his attorney, presumably because he had disputes with the hotel related to the gift shop.[5] Aniekwu was ordered by the trial court to produce numerous business documents. He produced tax returns prepared by a third party and a financial statement, but did not produce receipts,

---

[5] Aniekwu **further alleges that the law firm representing Daniels also represented the hotel and that Daniels was able to Atake undue advantage of unavailable records which are in control of the Dallas office@ of Daniels=s law firm. Other than Aniekwu=s allegations, there is no indication in the record that Daniels=s attorney was in any way involved in the hotel=s business or the retention or destruction of Aniekwu=s records.**

21

**underlying contracts, bids, or records of employee or subcontractor payments, arguing that he could not produce them because he did not have them in his possession.** Aniekwu explained that he Aestimated@ his business expenses and income but had no records to verify his recollections or estimates. **Aniekwu testified that he incurred substantial debt, in excess of $100,000, for equipment and expenses for the San Antonio project; he still owned equipment bought with the borrowed money.**

**Having reviewed the entire record, we hold the trial court acted within its discretion in excluding evidence that Aniekwu, through neglect or willful conduct, allowed to be lost.** *See Trevino*, **969 S.W.2d at 953;** *Schooley*, **984 S.W.2d at 666. Further, Aniekwu has not shown that the jury=s verdict turned on the excluded evidence.** *See Alvarado*, **897 S.W.2d at 753-54. We overrule his eighth issue.**

**Having overruled Aniekwu=s issues on appeal, we affirm the trial court=s judgment.**

_____

Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Affirmed

Filed:   October 24, 2002

Do Not Publish

22